Points decided.

[Filed June 20, 1889.]

# W. H. BIGGS, APPELLANT, *v.* GEORGE W. McBRIDE, SECRETARY OF STATE, RESPONDENT.

STATUTE — WHEN SAME TAKES EFFECT — EMERGENCY. — An act which passes both houses of the legislature, and which contains an emergency clause, followed by the words, that the same "shall take effect and be in force from and *after its approval by the governor*," but which the governor never approves, but vetoes, and the same is then duly passed by both houses by the necessary majorities, notwithstanding the veto, takes effect and is in force from and after its passage.

STATUTE — EMERGENCY CLAUSE — VETO — WHEN TAKES EFFECT. — Such act takes effect when the law-making power has done every act or thing necessary under the constitution to its complete enactment as a law.

CONSTITUTIONAL LAW — EMERGENCY — POWER OF THE LEGISLATURE. — The constitution has vested in the legislature the power to declare in the body or preamble of an act the emergencies by which it may be put in force in less than ninety days after the adjournment of the session; and when the emergency is specified in the act, the same is conclusive upon the courts, and is not reviewable.

EXECUTIVE OFFICE — POWER TO FILL VACANCIES. — By article 5, section 1, of the constitution, the chief executive power of the state is vested in a governor, but this does not include the power to fill vacancies in office. When and under what circumstances that power may be exercised by the governor is prescribed and defined by section 16 of the same article.

CONSTITUTIONAL LAW — CONTEMPORANEOUS CONSTRUCTION. — When a power has been exercised by one department of the government ever since the adoption of the constitution, and such exercise has been constantly acquiesced in by the other departments as well as the people, such practical construction is of great weight in doubtful cases, and should not be lightly regarded in any case.

OFFICE — REMOVAL FOR CAUSE — IS THE POWER JUDICIAL OR EXECUTIVE? — THE QUESTION STATED, BUT NOT DECIDED — OPPORTUNITY TO BE HEARD. — Whether the power to remove an officer *for cause* may be conferred upon the governor, or belongs exclusively to the judicial department of the government under the constitution, is not decided; but by whomsoever the power of removal for cause may be exercised, it must be done upon notice to the delinquent of the particular charges against him, and an opportunity be given him to be heard in his defense.

TRIAL — TITLE TO OFFICE — MANDAMUS. — *Mandamus* is not the proper proceeding by which to try the title to an office.

APPEAL from Marion County.

*Joseph Simon, Richard Williams,* and *George H. Burnette,* for Respondent.

*N. B. Knight, P. H. D'Arcy,* and *J. J. Murphy,* for Appellant.

STRAHAN, J.—This proceeding was instituted by the plaintiff, claiming to be one of the railroad commissioners of the state, against the secretary of state, to compel him by writ of *mandamus* to draw a warrant upon the state treasury for the sum of $277.77, being the amount claimed as plaintiff's salary up to the date of the filing of the petition for the writ.

The petition alleges, in substance, that George W. McBride is the duly elected, qualified, and acting secretary of state of the state of Oregon, and is, by virtue of said office, the auditor of public accounts; that your petitioner is one of the duly appointed, qualified, and acting railroad commissioners of the state of Oregon, constituting one of the members of the board of said railroad commissioners of said state, and has been such since the twenty-first day of February, 1889, at which time the appellant was duly appointed said railroad commissioner by Hon. S. Pennover, governor of the state of Oregon, in pursuance of a law duly enacted and passed at the fourteenth regular session of the legislative assembly of said state, and which was approved the 18th of February, 1887; that as such railroad commissioner your petitioner, on the thirty-first day of March, 1889, became entitled to receive for his services as such officer the sum of $277.77, in United States gold coin, for the quarter ending March 31, 1889; that on the first day of April, 1889, your petitioner applied to said defendant, at his office in the city of Salem, and requested and demanded that the defendant, as such secretary of state and auditor of public accounts, should audit, allow, and issue his warrant upon

the treasurer of the state for the payment of said $277.77, but that the defendant refused and neglected, and still does refuse and neglect, without lawful right or excuse, to either audit, allow, or issue his warrant upon said treasurer for the payment of said claim, or any part thereof; that your petitioner has no plain, speedy, or adequate remedy at law for the recovery of said sum of $277.77, which became justly due and owing to the plaintiff on the thirty-first day of March, 1889. Prayer that the writ of *mandamus* be awarded, etc. The defendant demurred to the writ, upon the ground that the same did not state facts sufficient to entitle the plaintiff to the relief prayed for, or to any relief, which demurrer was sustained, and the writ dismissed, from which judgment this appeal was taken. '

The appellant's notice of appeal specifies, in substance, the following grounds of error, upon which he intends to rely upon the appeal: 1. The court erred in sustaining the defendant's demurrer; 2. The court erred in denying the writ of *mandamus* prayed for in said cause; 3. The court erred in dismissing plaintiff's cause at his costs.

The board of railroad commissioners in this state was created by the act of the legislative assembly approved February 18, 1887. This act, among other things, provided that such board should consist of two persons, to be appointed by the governor from each of the two political parties, who should hold their offices for and during the term of four years, or until their successors are appointed as in said act provided; and if a vacancy occurs by resignation, death, or otherwise, the governor, in the manner thereinafter provided, was to appoint a commissioner to fill such vacancy for the residue of the term, and might in the same manner remove any commissioner *for cause.*

During the session of the legislative assembly next preceding the expiration of the term of office of the commis-

sioners first appointed by this act, and every four years thereafter, it was made the duty of the governor, by and with the advice and consent of the senate, to appoint the successors of such commissioners, who should in like manner serve for four years. It was further provided that said commissioners should be selected, one from the political party that cast the highest number of votes at the last general election in this state preceding his appointment, and one from the political party casting the next highest number of votes at said election. Pursuant to this act, a board of commissioners was appointed by the governor, who continued to serve until the sixteenth day of January, 1889, on which day the governor made an executive order removing them *for cause.*

On the twelfth day of February, 1889, the legislative assembly passed an act amendatory of the existing law on the subject of railroad commissioners, whereby the board was increased to three persons, and provision was made for choosing said commissioners biennially by the legislative assembly, and they were to hold office for the term of two years, and until their successors were elected and qualified.

The following emergency clause was added at the end of the bill: —

"Section 5. Inasmuch as the amendments herein proposed would greatly tend to benefit the people of this state, and there is urgent necessity therefor, this act shall take effect and be in force from and after its approval by the governor."

The act was vetoed by the governor on the nineteenth day of February, 1889; on the same day it passed the senate, notwithstanding the veto of the governor, by the requisite majority, and on the twentieth day of the same month it passed the house by a like majority, and was deposited in the office of the secretary of state.

On this statement, three questions have been argued before us and presented for our determination: 1. The event on which the last-named act was to take effect never happened. This left the first act in force under which the governor might lawfully appoint. 2. The amendatory act contains no emergency clause. It did not, therefore, go into effect until ninety days after the adjournment of the legislature. This view would also leave the first act in force during the ninety days, and the governor might exercise the power of appointment during that time. 3. But conceding that either of the objections are well taken, and that the amendatory act took effect on the twentieth day of February, 1889, still the legislative assembly could not exercise the power of appointment. That is an executive act, and belongs exclusively to the governor, under the constitution. These questions will be examined in their order.

1. The point of contention presented by the first question arises out of the language used in section 5 of the amendatory act, to the effect that the same should take effect and be in force from and after *its approval by the governor.* It is contended by the appellant that by the terms of the act itself it was only to be in force from and after its approval as aforesaid, and if the govenor failed to approve it, it could only take effect at the end of ninety days after the adjournment of the session. But it seems to me this argument proves too much. If the words "from and after its approval by the governor" are to be treated as a condition precedent, as the contention assumes, then it could never take effect, for the reason the condition had never happened. But this method of treating a grave constitutional question seems scarcely satisfactory. It seems more like a quibble over words than an attempt to ascertain what the legislature really meant by the use of the phraseology in question. I think

Opinion of the Court — Strahan, J.

there can be no doubt that the legislature used the language in question in the same sense they used the words "from and after its passage." Wherever an emergency clause was added to a bill, one of these forms of expression seems to have been used, and manifestly they are used to convey the same meaning. Turning to the Session Acts of 1889, on page 1, the form of expression used is, "shall take effect immediately upon its approval by the governor"; on page 4, the form used is, "shall take effect and be in force from and after its approval by the governor"; on the same page is another act, and the form of expression is, "shall take effect and be in force from and after its passage"; on page 6, the form is, "shall be in force from and after its approval by the governor"; on page 7, the same form of expression is used. On page 9 is the act regulating the sale of spirituous liquors in this state, and the same form is observed. [The governor did not approve this act, nor did he, within five days after it was presented to him (Sundays excepted), return it to the house in which it originated, with his objections, but filed it with the secretary of state. But it is useless to follow these forms of expression throughout the volume containing the laws enacted by the legislature of 1889. Every act containing an emergency clause concludes with one or the other of these forms of expression, with an occasional slight variation that does not affect the sense. A careful review of all of these acts, including the one under consideration, leads us to the conclusion that those are equivalent expression, and that they mean that the several acts in which they are used shall take effect and be in force from and after their passage; that is, from and after the time when the law-making power shall have done every act necessary under the constitution to their complete enactment as laws. This is the clear legislative intent, and by that

we must be guided in construing every statute, unless some principle of the constitution is invaded. The following cases sufficiently indicate the power of the legislature, and in what manner it is exercised in putting enactments into force: *Matter of Welman*, 20 Vt. 653; *Hamlet* v. *Taylor*, 5 Jones, 36; *Tarlton* v. *Pegg*, 18 Ind. 24; *Goodsell* v. *Boynton*, 1 Scam. 555; *State* v. *Click*, 2 Ala. 26; *Matter of Joseph Richardson*, 2 Story, 571; *People* v. *Clark*, 1 Cal. 406; *Baker* v. *Compton*, 52 Tex. 252; *Logan* v. *State*, 3 Heisk. 442; *The Brig Ann*, 1 Gall. 61; *Rathbone* v. *Bradford*, 1 Ala. 312; *Smets* v. *Weathersby*, R. M. Charlt. 537.

2. Article 4, section 28, of the constitution, provides: "No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law." It is contended by the appellant that there is no emergency declared in the body of this law, and that, therefore, the act did not take effect until ninety days after the adjournment of the legislature. In the absence of a constitutional or statutory rule upon the subject, all statutes would take effect from the first day of the session at which they are passed, at least that is the common-law rule. (Cooley's Constitutional Limitations, sec. 156.) But the constitution of this state has prescribed the rule by which every department of the government is bound, and the only duty the court has to perform is, to determine whether or not it has been complied with in this particular case. The emergency is declared in these words: "Inasmuch as the amendments herein proposed would greatly tend to benefit the people of this state, and there is urgent necessity therefor," etc., I do not think that the latter member of the sentence adds anything to the first.

It declares no emergency. It is the fact of the existence of any event or occasional combination of circumstances

which calls for immediate action or remedy, or the fact
that some pressing necessity or exigency exists which
enables the legislature, by declaring the same in the pre-
amble or body of the act, to put the same in force sooner
than the time prescribed in the constitution in cases
where there is no such emergency, or the same is not so
declared.

But in all such cases it is for the legislature to ascertain
and declare the fact of the existence of the emergency,
and its determination is not reviewable elsewhere.   The
constitution has vested the law-making department of the
government with the power to determine that question
(*Carpenter* v. *Montgomery*, 7 Black, 415; *Gentile* v. *State*,
29 Ind. 409), and such determination is not made review-
able in the courts.   No doubt the emergency must be
declared in the body or preamble of the act, but if there
is no fact, event, or state or condition of affairs mentioned
which the legislature determines creates an emergency,
no difference how strongly or directly it may be asserted
in the act that it is necessary that it should go into effect
immediately, the legislative declaration must fail, for the
reason that the constitution is not complied with.   By the
act under consideration it is declared that the amendments
proposed therein "would greatly tend to benefit the people
of this state."   "Benefit to the people" is the object and
purpose of all government; and where the result is mani-
fest, no doubt the legislature ought to resort to unusual
and even extraordinary ends to attain it.   It is true, in
this case, we may be unable to perceive in what manner
the proposed benefit is to accrue; but the legislature hav-
ing declared that the people will be benefited, we must
assume that such determination is proper, and, so far as
the court is concerned, final.   Such determination is in
its nature political, and not judicial, and for such errors,
if they be errors, the remedy must be found in the virtue

and intelligence of the people. The ballot-box is the medium through which they may be corrected.

3. The third question remains to be considered. It has been argued, in effect, on the part of the appellant, that, under the constitution of this state, the legislature cannot create a new office — one not provided for by the constitution — and fill it by an election in joint convention of the two houses; that while it is competent for the legislature to create such additional offices as the public necessities may require, still, when created, if an election by the people is not provided for, the right to fill the same by appointment is devolved upon the governor by the constitution. In other words, the right to fill a vacant office belongs to the executive as one of the duties pertaining to his office, and that the assumption on the part of the legislature to fill the office of railroad commissioners by persons of their own selection is a usurpation, by that department of government, of powers that are vested by the constitution in the executive. By article 3, section 1, of the constitution, it is provided: "The powers of government shall be divided into three separate departments, — the legislative, the executive, including the administrative, and the judicial, — and no person charged with official duties under one of these departments shall exercise any of the functions of another except as in this constitution expressly provided." For most practical purposes, the line of demarkation which separates the three departments of government the one from the other are obvious enough, and there is but little probability that one department will assume to exercise functions which properly belong to one of the others. It is only where the power in question lies near the border-line that any serious question can arise, and then it must be determined on its own particular facts.

In *Wynham* v. *People,* 13 N. Y. 391, the court of appeals

pointed out the difficulty of attempting any general defi-
nition of this distribution of powers. Speaking through
Comstock, J., the court said: "I entertain no doubt that,
aside from the special limitations of the constitution,
the legislature cannot exercise powers which are in their
nature essentially judicial or executive. They are by the
constitution distributed to other departments of the gov-
ernment. It is only the legislative power which is vested
in the senate and assembly. But when the constitution
is silent, and there is no clear usurpation of the powers
distributed to the other departments, I think there would
be great difficulty and great danger in attempting to de-
fine the limits of this power. Chief Justice Marshall said:
'How far the power of giving the law may involve every
other power, in cases where the constitution is silent,
never has been, and perhaps never can be, definitely
stated.' That very eminent judge felt the difficulty; but
the danger was less apparent then than it is now, when
theories, alleged to have been founded in natural reason
or inalienable rights, but subversive of the just and neces-
sary powers of government, attract the belief of consider-
able classes of men, and when too much reverence for
government and law certainly are among the least of the
perils to which our institutions are exposed. I am re-
luctant to enter upon this field of inquiry, satisfied, as I
am, that no rule can be laid down in terms which may
not contain the germ of great mischief to society, by giv-
ing to private opinion and speculation a license to oppose
themselves to the just and legitimate powers of govern-
ment." It was not claimed at the argument that there is
any express provision of the constitution which author-
ized the governor in direct terms to make the appoint-
ment in question, but that it is included in the grant
contained in section 1, article 5, of the constitution.
That section declares: "The chief executive power of

the state shall be vested in a governor." Now, if it could be shown that the power to appoint all officers which are not expressly made elective by the people is a part of "the chief executive power of the state," the appellant's contention would be sustained. But no authority whatever has been cited to sustain this view, nor is it believed that any exists. On the contrary, the provisions of the fifth article of the constitution, which relates to the executive department, all seem at variance with this view. The framers of this instrument evidently designed that no prerogative powers should be left lurking in any of its provisions. No doubt they remembered something of the history of the conflicts with prerogatives in that country from which we inherited the common law. They therefore defined the powers of the chief executive of the state so clearly and distinctly that there ought to be no controversy concerning the method of filling the same, or in some cases of changing the method of filling an existing office. In 1870, the legislature, by an act, created a vacancy in the office of clerk of this court, and provided for filling the same by an election in joint convention of the two houses. (Acts 1870, p. 58.) A clerk was elected under this act by the legislature and served by virtue of such election until the law was repealed and the power to appoint vested in the court. The librarian has always been selected by the legislature since the office was created, and so has the pilot and fish commissioners, and when the office of state geologist was created, the legislature named the officer in the body of the act. (Acts 1872, p. 105.) The power exercised by the legislature in the appointment of some of these officers is almost coeval with the constitution. The power thus exercised has never been called in question, but has ever been acquiesced in by every department of the government, and is in itself a contemporaneous construction

of the constitution, which, if the question were doubtful, might be sufficient to turn the scale in its favor. Under any view, such construction is entitled to great weight, and could not be lightly regarded.

4. Thus far, nothing has been said on the subject of the power of the governor to remove the railroad commissioners. The act under which they were appointed provided that he might remove them *for cause.* This clearly implied that they could not be removed at the mere will of the governor, or without cause. Whether such a power is so far judicial in its nature that it cannot constitutionally be vested in the chief executive, as many authorities hold (*Page* v. *Hardin,* 8 B. Mon. 648; *Curry* v. *Stewart,* 8 Bush, 560; *Hyde* v. *State,* 52 Miss. 665; *State* v. *Pritchard,* 36 N. J. L. 101; *Honey* v. *Graham,* 39 Tex. 1; *Dallam* v. *Wilson,* 53 Mich. 392), or whether it is in its nature executive, and therefore properly belongs to the governor, we do not at this time undertake to determine. But it is believed, under either view, and by whomsoever the power of removal for cause may be exercised, it must be done upon notice to the delinquent of the particular charges against him, and an opportunity be given him to be heard in his defense. (*Dallam* v. *Wilson, supra; Attorney-General* v. *Hawkins,* 44 Ohio St. 98; *People* v. *Fire Commissioners,* 72 N. Y. 445; *People* v. *Mayor of the City of New York,* 19 Hun, 441.) But we do not decide this question now, and we only refer to it to avoid misconception.

5. There is another question I think proper to mention for the same reason. The ostensible object of this proceeding is to obtain payment from the state treasury of the salary plaintiff claims as railroad commissioner, but we cannot shut our eyes to the fact that its real object is to try the plaintiff's title to that office, and that is the question discussed; but no objection was made by the respondent; and on account of the public importance of

the questions involved, we deem it best to indicate an opinion on them. The better view is, that this is not the proper proceeding to try the title to an office. (High on Extraordinary Legal Remedies, sec. 42; Moses on Mandamus, 150; *People* v. *Olds*, 3 Cal. 167; *Meredith* v. *Supervisors of Sacramento*, 50 Cal. 433; *Warner* v. *Meyers*, 4 Or. 72; *People* v. *New York*, 3 Johns. Cas. 79; *People* v. *Stevens*, 5 Hill, 616; *Matter of Gardner*, 68 N. Y. 467; *State* v. *Auditor*, 34 Mo. 375; *State* v. *Auditor*, 36 Mo. 70; *People* v. *Detroit*, 18 Mich. 338.) Something was said at the argument in relation to a stipulation that this question should not be insisted upon by the respondent. The stipulation does not appear of record, and if it did, it would not affect the result. Such a stipulation would be contrary to law, and could not be enforced. The law has fixed the extent and uses to which the writ of *mandamus* may be applied, and the stipulation or agreement of the parties can neither enlarge nor lessen the same.

The judgment of the court below must therefore be affirmed.