[Civil No. 1740.   Filed November 4, 1919.]

[185 Pac. 136.]

# BEN R. CLARK, Appellant, v. JESSE L. BOYCE, Auditor of the State of Arizona, Appellee.

1. CONSTITUTIONAL LAW—POWER OF LEGISLATURE.—The legislature has all power not prohibited to it by the state or federal Constitution.

2. STATES—POWER OF GOVERNOR.—The governor can exercise only such power as is granted to him by the state Constitution.

3. CONSTITUTIONAL LAW — CONSTRUCTION OF CONSTITUTIONAL PROVISIONS.—Provisions of the Constitution dealing with same subject matter are to be construed together.

4. STATUTES — TIME OF TAKING EFFECT — EMERGENCY ACT NOT APPROVED BY GOVERNOR.—Laws of 1919, chapter 160, relating to state land department, having been passed as emergency legislation and having been retained by the Governor without approval or veto for ten days after adjournment of legislature, took immediate effect as a law under Constitution, article 4, sections 12 and 13, and article 5, section 7, notwithstanding article 4, section 1, subdivision 3, requiring emergency bill to be passed by a two-thirds vote "and also approved by the Governor."

5. STATUTES—EMERGENCY LEGISLATION—NECESSITY OF GOVERNOR'S APPROVAL.—Under Constitution, article 4, section 13, and section 12, requiring that "every measure . . . be presented to the Governor for his approval or disapproval," and article 5, section 7, providing that "any bill," not returned within five days, or filed with objections within ten days after adjournment, shall become a law, an emergency measure retained by Governor without action for ten days after adjournment took immediate effect, notwithstanding article 4, section 1, subdivision 3, requiring emergency bill to be passed by two-thirds vote "and also approved by the Governor," since, being a "bill," an emergency measure can become a law in same manner as ordinary measures, by express approval of Governor, by passage over veto, or by Governor's failure to return bill.

6. STATUTES — EMERGENCY LEGISLATION — APPROVAL BY GOVERNOR.—Constitution, article 5, section 7, relating to Governor's power to approve or veto bill, is applicable to emergency as well as ordinary measures notwithstanding provision that "this section shall not apply to emergency measures as referred to in section 1 of the article on the legislative department"; such provision, in view of section 1, having reference merely to preceding sentence relating to reconsideration and passage of bills over Governor's veto.

7. CONSTITUTIONAL LAW — CONSTRUCTION OF CONSTITUTIONAL PROVISIONS.—The prime effort in construing constitutions is to ascertain

the intention of those who framed them, and, to give effect to the intention therein expressed when such intention can be collected therefrom, words may be modified, altered, or supplied so as to obviate any repugnancy to or inconsistence with such intention, although in so doing particular provisions may not be read or construed according to their literal meaning.

APPEAL from a judgment of the Superior Court of the County of Maricopa. S. L. Pattee, Judge. Reversed.

Messrs. Ward & Griffeth and Mr. W. E. Ryan (Mr. Frank E. Curley, *Amicus Curiae*), for Appellant.

Mr. Wiley E. Jones, Attorney General, Mr. L. B. Whitney and Mr. Alexander B. Baker, Assistant Attorneys General, for Appellee.

ROSS, J.—This is an action in *mandamus* brought by appellant, as deputy land commissioner, to compel appellee as state auditor to issue a voucher in appellant's favor for his salary as provided for in chapter 160, Session Laws of 1919.

It appears that the Attorney General, having advised the auditor that said chapter did not become a law because it was not signed by the Governor, the auditor, acting upon such advice, refused to O. K. the demanded salary. Chapter 160 as published in the Laws of 1919 contains this notation:

"This bill having remained with the Governor ten days, Sundays excluded, after the final adjournment of the legislature, and not having been filed with his objections, has become a law this 26th day of March, 1919.

"MIT SIMMS,
"Secretary of State."

The act as passed by the legislature contains a declaration of emergency, and it is for that reason that the Attorney General contends that, before it could become a law, it must be approved by the signature of the Governor. It is the contention of appellant that the approval of the bill by signing it was not essential to its becoming a law, and this was the sole question involved at the trial and is the sole question that we have before us. The learned trial judge, although expressing the view that chapter 160 was a valid and subsisting law immediately effective, forewent his convic-

·tions and held that the law became effective ninety days after date, following the ruling of this court in *Santa Cruz County* v. *McKnight, ante,* p. 103, 177 Pac. 931, and sustained appellee's demurrer to the complaint because the claimed salary did not begin to accrue until ninety days after March 26, 1919; the suit having been filed before the expiration of that time. It seems that both the appellant and appellee are dissatisfied with that conclusion; the appellant contending that it took effect as an emergency law or not at all, and the appellee that it never had the force or effect of law. This diversity of opinion arose out of the wording of our Constitution, and we must admit that it has cost us no little trouble to arrive at a conclusion.

The controversy is as to what construction shall be placed upon subdivision 3, section 1, of article 4, Initiative and Referendum, of the Constitution, which reads as follows:

"The second of these reserved powers is the referendum. Under this power the legislature, or five per centum of the qualified electors may order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the legislature, except laws immediately necessary for the preservation of the public peace, health or safety, or for the support and maintenance of the departments of the state government and state institutions; but to allow opportunity for referendum petitions, no act passed by the legislature shall be operative for ninety days after the close of the session of the legislature enacting such measure, except such as require earlier operation to preserve the public peace, health, or safety, or to provide appropriations for the support and maintenance of the departments of state and of state institutions; provided, that no such emergency measure shall be considered passed by the legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each house of the legislature, taken by roll-call of ayes and nays, and also approved by the Governor; and should such measure be vetoed by the Governor, it shall not become a law unless it shall be approved by the votes of three-fourths of the members elected to each house of the legislature, taken by roll call of ayes and nays."

This subdivision of the Constitution recognizing the people as the repository of all power has provided that all legislative acts passed by the legislature shall be subject to the referendum except emergency measures. To give the people an opportunity to invoke the referendum, if they so choose, laws not emergent do not go into effect at once, but become operative ninety days after the final adjournment of the legislature. Emergency laws when passed according to the forms prescribed by the Constitution, become effective at once and prevent a referendum. The quantum of votes to pass such measures is made greater than is necessary to pass an ordinary bill. It requires two-thirds of both houses and, as against a veto, three-fourths of both houses to pass an emergency bill. An ordinary bill or one subject to the referendum may be passed by a majority vote of both houses and over the Governor's veto by a two-thirds vote. This is not the only difference required in the procedure to be pursued by the legislative body in the enacting emergency and ordinary laws. An emergency bill, in order to become a law as such, must contain in a separate section a declaration of emergency. Appellee contends that a bill may contain the declaration provided and receive the necessary two-thirds vote on the final passage and still fail to become a law. In other words, he claims that the expression, "no such emergency measure shall be considered passed by the legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative and shall be approved by the affirmative votes of two-thirds of the members elected to each house of the legislature taken by a roll-call of ayes and nays and also approved by the Governor," must be literally construed; that the three things therein enumerated must concur in order for it to become a law; and that the approval must be indicated by the Governor signing the bill as provided in section 7, article 5, of the Constitution.

We think this construction is somewhat unhorsed by the next clause, "and should such measure be vetoed by the Governor, it shall not become a law unless it shall be approved by the votes of three-fourths of the members elected to each house of the legislature, taken by roll-call of ayes and nays." This last expression is a declaration by the framers of the Constitution that "such measure" may be-

come a law without the Governor's signature inasmuch as no
bill passed over the Governor's veto is ever signed by him.
There is then at least one exception made by the Constitu-
tion whereby "such emergency measure" may become a law
without the Governor's approval by signing. The expres-
sion, therefore, that "no such emergency measure shall be
considered passed by the legislature . . . ," etc., is not
equivalent to saying that no such emergency measure shall
become a law. If it does mean that, that is the end of it.
However, failing to receive the signature of the Governor,
the bill is not dead nor become *functus officio*. It has not
lost its status as a proposed law.

But suppose we give the expression, "and also approved
by the Governor," the meaning contended for, then we cause
the framers of the Constitution and the people who ratified
it to clothe the Governor with an absolute veto even while
the legislature is in session. All he has to do is to retain the
bill without any action whatever, and this applies to all
emergency measures. His retention of the bill for five days,
the legislature being in session, or ten days after its adjourn-
ment without action, would not, as in ordinary bills, cause
it to become a law as provided in section 7, article 5.

The legislature has all power not prohibited to it by the
state or federal Constitution. The Governor can exercise
only such power as is granted to him by the state Constitu-
tion. Functioning as a part of the legislature, his acts are
negative in their nature. Under no Constitution, federal or
state, so far as we are advised, is his approval absolutely
essential, for they all contain provisions by which bills may
become laws without his signature—as where he keeps the
bills in his possession without action for three days or five
days or ten days as the case may be, the legislature being in
session. His veto is not absolute, but qualified, as, under
most Constitutions, the legislature may pass the bill over his
veto. *Harpending* v. *Haight,* 39 Cal. 189, loc. cit. 201, 2
Am. Rep. 432, 13 Pac. 189, loc. cit. 201, 12 R. C. L. 1005,
According to the appellee's contention, the Governor must
either sign the bill or veto it. Failing to do either, the bill
is destroyed even though it may have received the unani-
mous vote of both houses. We think such a construction
would indict the people of doing something far from their
intention. As we shall see later, no Governor of the state

has thought. or assumed he possessed such absolute power of veto, nor have the people or the legislature thought so.

If we give this troublesome expression a literal meaning, it involves the negation of what we know to be facts. We know, notwithstanding, that the Governor has nothing whatever to do with a bill, emergent or otherwise, until after its final passage by the legislature. "Every measure when finally passed shall be presented to the Governor for his approval or disapproval," is the language of the Constitution (section 12, article 4). While he is an arm of the legislature, he has nothing to do with the introduction or passage of bills. He cannot put into a bill or take out of a bill an emergency declaration or anything else. So, to say that "no such emergency measure shall be considered passed by the legislature" unless it be "also approved by the Governor," is a contradiction of terms and, under the very language of the Constitution, as well as by common understanding, not true in fact. What the framers meant, and we say this in view of other provisions of the Constitution, must have been that an emergency measure shall become a law immediately effective if it contain an emergency declaration, receive a two-thirds vote of both houses, and be approved by the Governor, or, if vetoed, may become a law by a three-fourths vote of both houses, leaving the bill, if he fails to expressly approve or expressly disapprove, to take the course of ordinary bills. We must look to the Constitution to see what that course is. It is not found in subdivision 3, section 1, article 4. It is found, however, later on where the forms to be pursued by the legislature in enacting laws are provided for. "Every measure, when finally passed, shall be presented to the Governor for his approval or disapproval." This includes emergency bills as well as ordinary bills, and is a direction to the legislature as to the disposition to be made of bills after their final passage.

The same thought, but with different phraseology, is contained in section 7, article 5, entitled "Executive Department." This last section provides, in short, that, when a bill is presented to the Governor and he approves, he shall sign it; if he disapproves, he shall return the bill to the house of its origin with his objections, and if it is passed over his veto by the necessary votes of both houses it becomes a law. If *any* bill be not returned within five days, the legisla-

ture being in session, it shall become a law in like manner as
if he had signed it, or if in ten days after final adjourn-
ment, Sundays excepted, he fail to veto the bill, it becomes
a law as provided in the Constitution; that is, as if he had
signed it. If he fail to sign the bill, the law steps in and
declares that it shall become a law in *like manner* as if
signed. If signed, it is an approval, and, if not signed, it
is in like manner made an approval, or the equivalent thereof.
If therefore we take the view that an emergency measure
not "also approved by the Governor" and not passed over
his veto is still a bill to be acted upon as ordinary measures,
and we must do that or else there is no provision in that re-
spect covering emergency measures, we have no conflict be-
tween subdivision 3, section 1, article 4, and section 7, article
5. In the latter section are defined all the powers and duties
of the Governor functioning as a part of the legislature.
Therein he is required to act upon *every* bill passed by
the legislature and give each one the same consideration and
attention, and "any bill" not expressly signed by him or
expressly vetoed by him within the time therein expressed
becomes a law as if signed.

If, however, we take the view contended for by the appel-
lee—that an emergency bill can only become a law when
expressly approved by the Governor or passed over his veto—
we have an irreconcilable conflict between said subdivision 3
and section 7, article 5. Nor will it do to say that subdi-
vision 3 is a special statute whose terms should control as
against the general provisions in section 7. Subdivision 3
cannot stand alone. It is affected by section 12, article 4,
requiring that every bill be read by sections on three dif-
ferent days and be presented to the Governor; it is affected
by section 13, Id., requiring every act to embrace but one
subject and matters properly connected therewith; and it is
affected by section 7, article 5, providing for its presenta-
tion to the Governor for his action or nonaction thereon.

Bills, emergent or otherwise, it is provided in section 7,
article 5, shall be filed with the secretary of state "after final
action by the Governor," and all become laws as if signed
by him unless within ten days after final adjournment of
the legislature he vetoes them.

These plain and explicit provisions of the Constitution
can only be given force and effect in their entirety by con-

struing subdivision 3, section 1, article 4, in connection with section 7, article 5, as declaring that an emergency measure may become a law in three ways, the same as ordinary measures, viz.: (1) By express approval of the Governor; (2) by passage over his veto; and (3) by silent acquiescence or by implied approval in not returning a bill in five days, the legislature being in session, or by his failure to veto within ten days after the final adjournment of the legislature, Sundays excepted. This construction will also uphold subdivision 3 and cause the two apparently conflicting provisions to harmonize; because if it be construed as providing only that a bill shall not be considered passed unless it have a declaration of emergency, receive a two-thirds vote of both houses, and be also approved by the Governor, it is not equivalent to saying that it shall not become a law in the manner provided in the Constitution. It is elementary that subdivision 3 and section 7, treating as they do the same subject matter, to wit, the forms to be pursued in enacting laws, should be construed together. As was said in *Hoag* v. *Washington-Oregon Corporation*, 75 Or. 588, 611, 147 Pac. 756, loc. cit. 762:

"The two clauses of the section, considered disjointly, are contradictory, but, when they are considered, as they should be, as parts of one section, and as modifying and explaining each other, the difficulty vanishes; and here may be invoked the salutary rule cited in Potter's Dwarris on Statutes and Constitutions, page 144, as follows: 'In the construction of a statute, every part of it must be viewed in connection with the whole, so as to make all parts harmonize if practicable, and give a sensible and intelligent effect to each.'"

We conclude that the bill in question passed as an emergency measure and took effect at once. *Bennett Trust Co.* v. *Sengstacken*, 58 Or. 333, 113 Pac. 863; *Biggs* v. *McBride*, 17 Or. 640, 5 L. R. A. 115, 21 Pac. 878; *Seven Hickory* v. *Ellery*, 103 U. S. 423, 26 L. Ed. 435.

In *Santa Cruz County* v. *McKnight, ante,* p. 103, 177 Pac. 256, and *Ross* v. *Cochise County, ante,* p. 167, 177 Pac. 931, a contrary view as to when an emergency act takes effect, to what we here announce, was expressed. In neither of those cases was the question formally briefed or argued to the court, and the question was not given that consideration to which it was entitled. Besides, in neither case was it

necessary to a decision. Our investigation of the law now convinces us that we were wrong in stating that an emergency measure would not take effect as such unless signed by the Governor.

We now come to another feature of this controversy. The Attorney General, on behalf of the appellee, insists that section 7, article 5, cannot be invoked to aid the enactment of emergency measures; that therein it is so stated; and that that is all there is to it.

Section 7 is divided into four paragraphs. At the end of the first paragraph is found this sentence:

"This section shall not apply to emergency measures as referred to in section 1 of the article on the legislative department."

By giving this sentence literal meaning, the contention is right; but to do so would place it within the power of the executive to defeat all emergency measures by the simple method of "pocketing" the bill.

Section 1 of the article on the "Legislative Department" is incomplete, in that it does not provide how the Governor shall approve a bill or when, nor how he shall veto it nor when, nor what the legislature shall do with it after it is passed, nor does it provide that bills passed by the legislature shall be presented to the Governor. It is not conceivable that the people, in writing their Constitution, intended that emergency measures should not be presented to the Governor for his approval and take the same course as other bills. We think the only differentiation intended by the Constitution between emergency bills and other bills was that the former, on their final passage, should be approved by a two-thirds vote of the houses and, if vetoed, should receive the affirmative approval of a three-fourths vote, whereas the latter should receive on final passage a majority of all members elected to each house and, if vetoed, after reconsideration, should be passed by a two-thirds vote of each house. We conclude that the sentence, "this section shall not apply to emergency measures as referred to in section 1 of the article on the legislative department," was inserted for the purpose of modifying the sentence that immediately precedes it to carry out that difference in emergency measures and ordinary bills, and that the correct rendering of that sentence would be something like this: "This *sentence* shall not apply to

emergency measures as referred to in section 1 of the article on the legislative department.'' This construction will give meaning to the exception implied in said sentence and will at the same time not render nugatory and ineffective the other parts of section 7, article 5, as applied to legislation, either emergent or otherwise.

The prime effort in construing Constitutions or statutes is to ascertain the intention of those who framed them, and ''to give effect to the intention therein expressed when such intention can be collected therefrom, words may be modified, altered or supplied so as to obviate any repugnancy to or inconsistency with such intention, although in so doing particular provisions may not be read or construed according to their literal meaning.'' *State Pub. Utilities Commission* v. *Monarch Ref. Co.*, 267 Ill. 528, Ann. Cas. 1916A, 528, 108 N. E. 716; *State* v. *Osborne*, 14 Ariz. 185, 125 Pac. 892; *Deyo* v. *Arizona Grading Co.*, 18 Ariz. 149, L. R. A. 1916E, 1257, 157 Pac. 371; *Gherna* v. *State*, 16 Ariz. 345, Ann. Cas. 1916D, 94, 146 Pac. 494; *Carter* v. *Barnes*, 87 S. C. 102, 68 S. E. 1054; *Leader Printing Co.* v. *Nicholas*, 6 Okl. 302, 50 Pac. 1001, 1003; 6 R. C. L. 47, § 1; Cooley's Constitutional Limitations, 4th ed., 70.

Now, if the expression, ''this section shall not apply to emergency measures as referred to in section 1 of the article on the legislative department,'' is limited in meaning as above indicated, it emphasizes the idea that all the other portions of section 7, article 5, do apply to emergency measures. Reduced to a simple statement, it means that the rule of a majority to pass a law as therein stated should be modified as applied to emergency measures as requiring a two-thirds vote or, when vetoed by the Governor, a three-fourths vote. Otherwise, the provisions of section 7, article 5, are to apply to emergency measures as well as ordinary measures. This section 7 then, if not in direct language, has, by every intendment, provided that an emergency measure may become a law in the same manner as any ordinary bill.

The view we have herein expressed accords with the construction placed upon our Constitution by the executive and legislative departments. Beginning with the first session of the legislature after the adoption of the Constitution up to and including the last session, emergency bills have been passed, certified, and published as laws without receiving

the signature of the Governor. All of these laws have been recognized as valid and subsisting by all the departments of state. In the Session Laws of 1912 there are found three of such measures, to wit, chapters 5, 93 and 94; in the Laws of 1915, regular session, are found seven, to wit, chapters 55, 58, 60, 61, 63, 65 and 66; in the first special session, 1915, chapters 2, 3 and 4; in the second special session, 1915, chapter 11. In the Session Laws of 1917 there are found five, to wit, chapters 73, 77, 80, 85 and 88; and in the last session, 1919, there are five such bills unsigned by the Governor, to wit, chapters 55, 157, 160, 162 and 166.

Without undertaking to analyze these different chapters found in our laws, it is enough to state that they pertain to a great diversity of subjects, such as the expenditure of money by incorporated cities, classification of counties, fixing of salaries of county officers, compensation of court reporters, the duty of the state treasurer, changes in the insurance law, the construction of sewers, waterworks, lighting plants in cities and towns, and providing for the issuance of bonds in payment of same, a general appropriation bill, an act providing for the semi-annual payment of taxes, appropriations for the state highway, affecting rules of procedure and evidence, etc. All these laws have been treated by the different departments of state as immediately effective, and for this court now to declare, as contended for by appellee, that they were not laws at all, or that they took effect, not immediately, but ninety days after the adjournment of the session, might cause chaotic conditions that we should avoid if possible. How far-reaching or how unsettling such a conclusion might be, so far as vested and fixed rights are concerned, we cannot tell; but it may be easily surmised that much trouble and litigation would result. If we had greater doubt of the correctness of the construction that we have placed upon the constitutional provisions as affecting the enactment of emergency laws, we would still feel constrained, on account of the public and private interests involved, to heed the unbroken course of conduct by the other two departments. Many of the members of the constitutional convention were members of the first and other sessions of the legislature. The president of the constitutional convention was the Governor of the state during the sessions of 1912 and 1915. In *Laird* v. *Sims,* 16 Ariz. 521, L. R. A. 1915F, 519, 147 Pac. 740, we indorsed the rule that

a construction of the fundamental law by members of the legislature who were also members of the constitutional convention was entitled to great weight.

In *Detroit* v. *Chapin,* 108 Mich. 136, 37 L. R. A. 391, 66 N. W. 587, the court had under consideration the power of the Governor in approving bills passed by the legislature, and it was there said:

"We are cited to instances where this construction has been given to this section by the Governors, and there are numerous acts whose validity depends on the question involved here. If the question were more doubtful than it is, we might properly consider the force of a practical construction of co-ordinate branches of government, acquiesced in by the general public for a long period. In commenting upon this subject, Mr. Justice COOLEY says: 'Great deference has been paid in all cases to the action of the executive department, where its officers have been called upon, under the responsibilities of their official oaths, to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed all considerations, and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind.' Cooley's Constitutional Limitations, pp. 83, 84. He supports it by numerous cases."

In *Solomon* v. *Cartersville,* 41 Ga. 157, the question was as to the time when the Governor should sign bills in the exercise of his legislative powers, and that court yielded its judgment on the question to the construction placed upon the Constitution by the executive department because of the public interest involved. It was there said:

"If this was an original question, independent of any construction heretofore given by the executive department of the state government, to this clause of the Constitution, we should be inclined to hold that the Governor could not approve and sign any bill after the adjournment of the General Assembly; but on looking into the past history of our legislation, we find that it has been the practice for many years for the Governor to take five days after the adjournment of the General Assembly for the revision of bills passed by that

body and to approve and sign the same within that time; *but not afterwards,* and that a large number of the most important acts now upon the statute books of the state have been so approved and signed, which usage, and practice of the executive department of the state government should not now, in our judgment, be disturbed or set aside.''

This case has been cited and followed by many other courts, among them the United States supreme court in *Seven Hickory* v. *Ellery, supra.*

The rule, as stated by Judge COOLEY, as to the controlling effect of contemporaneous construction by the other departments of state, especially where the question is involved in doubt, seems to have found general approval, not only by the courts, but by the text-writers. 6 R. C. L., p. 63, §§ 60, 61.

12 Corpus Juris, page 712, section 65, states the rule as follows:

''Contemporaneous or practical construction of an ambiguous provision of a Constitution by the legislative or executive departments of the government is always important, and is frequently of controlling influence in determining its meaning. The value of such practical construction is especially recognized where the participants in it are men of repute as lawyers and judges. In doubtful cases the courts will often apply such construction as of course, or will yield to it as a matter of policy. It is evident that to reverse a construction put on a constitutional provision by a department charged with its execution, after it has received such practical construction for any length of time, would be to occasion great injury to those who would be affected by such a change; and it is to avoid such injustice that courts have often yielded to policy and expediency in adopting practical constructions of constitutional provisions and statutes by the other departments of the government, even though erroneous; and in view of these considerations, in all cases where there is doubt as to the meaning of such provision or statute, the courts will adopt and follow contemporaneous and practical construction by the other departments.''

The judgment of the trial court is reversed, and the cause remanded, with directions that further proceedings be had in accordance with this opinion.

BAKER, J. (Concurring).—I concur in the opinion stated by Judge ROSS, although it must be confessed that the question is not free from doubt, and much can be said in favor of the view taken by the Attorney General; yet, upon the whole, I think the provisions of subdivision 3, section 1, part 1, of article 4, and section 7, of article 5, of the Constitution, may be reconciled upon the application of the familiar rule that courts always strive to harmonize apparently conflicting provisions of a Constitution or statute upon the same subject matter in order that each provision may survive and neither perish. Statutes and Statutory Construction, 1 Fed. Stats. Ann., 2d ed., pp. 49, 50. In view of this rule of construction, I concur, as well as for other and additional reasons, one of which is that any other view would involve the inconceivable condition that, although the two houses of the legislature might unanimously pass an emergency bill and send it to the Governor, he might pocket it, and so, without any action on his part, not only prevent the bill from becoming a law, but also deny to the two houses of the legislature all opportunity to say whether it shall become a law notwithstanding his failure to approve it. Thus, the Governor would be clothed with a greater power through nonaction than he is possessed of through a direct and positive veto—a most extraordinary result. It is inconceivable that the framers of the Constitution, and the people who adopted it, ever intended to confer upon the Governor such autocratic power; it is inconsistent with the theory of our government.

It is contended by the Attorney General that the expression, " . . . also approved by the Governor," as it is used in subdivision 3, section 1, part 1, of article 4, means that the Governor's approval of an emergency bill must be evidenced by his signature to the bill; but, if such was the intention of the framers of the Constitution, it is reasonable to conclude that they would not have expressed such intention in general terms when it was just as easy for them to have said that the approval should be in writing—that is, that the Governor should sign the bill, if he approved it. They would then have excluded any consideration of the provision of section 7, article 5, relative to the tacit or implied approval of a bill by the Governor, which provision is just as sacred and as well guaranteed and guarded by the Constitution as the express approval of a bill.

If the expression, " . . . also approved by the Governor," stood alone in the Constitution, and we were construing the expression without any reference to the clause in section 7 of article 5, providing for the tacit or implied approval of a bill by the Governor, it might be said, with much reason, that the expression imported that the Governor should sign the bill if he approved it; that is, he should make his approval known to all men with absolute certainty by some visible, unmistakable, and enduring mark, to wit, by written declaration attested by his signature. But this construction would then be placed upon the expression only for the purpose of negativing the thought or impression that the Governor's approval might be unexpressed and resting in parol. When the question is made, Is such an act of the legislature binding upon the people as a law? it would be unendurable that the question should depend for decision upon the memory or testimony of an officer as to what was his unexpressed thought at a former time concerning it. *New York & N. E. R. R. Co.* v. *City of Waterbury,* 55 Conn. 19, 10 Atl. 162. But here, in construing the expression, we must also look at the provision in section 7, article 5, relative to the tacit or implied approval of a bill by the Governor. That provision of itself constitutes an enduring, visible and unmistakable sign or mark importing that the Governor had considered the propriety of the bill then before him and that he was willing that it should pass and become a law. Speaking of a similar provision, the supreme court of Kansas, in *State* v. *Sessions,* 84 Kan. 856, Ann. Cas. 1912A, 796, 115 Pac. 641, loc. cit. 645, said:

"A law is not complete until it has been finally acted upon by the two houses and by the Governor. The action of the latter, it is true, may be only negative, as when he permits a bill to become a law by failing to return it in the prescribed period, still this implies consideration and authority. Until a bill has received the final consideration of the three law-making powers, viz., the house, the senate and the Governor, it is not a law"—citing cases, *Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 462.

In *Bennett Trust Co.* v. *Sengstacken,* 58 Or. 333, 344, 113 Pac. 863, loc. cit. 867, the court had under consideration an emergency measure in which the emergency clause provided that the act should take effect from and after its approval

by the Governor. As a matter of fact, the Governor did not sign the bill. The court said:

"Considering the Governor as a part of the legislative power by virtue of his prerogative to approve or object to any act of the legislative assembly, yet the Constitution gives effect to his inaction, as well as to his affirmative action in such cases.

" . . . Under such circumstances the Constitution expressly says the bill shall be a law without his signature. We conclude that with respect to the act in question the legal process of making it a law was complete when the Governor did not return the bill to the house whence it originated within five days from the date it was presented to him, and that all its provisions, including the emergency clause, became effective at once on the completion of that process"— citing cases, *Biggs* v. *McBride,* 17 Or. 640, 5 L. R. A. 115, 21 Pac. 878.

When considering the two provisions together, I very seriously doubt if we have the right to import into the expression, " . . . also approved by the Governor," any word or words indicating that such approval must be in writing. We must construe it as we find it, and take it as it is. The framers of the Constitution omitted any such word or words, and it is to be presumed that such omission was intentional, and, if the omission was intentional, the conclusion seems irresistible that it was suffered to exist for the purpose of avoiding any conflict with the provision in section 7, relative to the tacit or implied approval of a bill, leaving that provision to operate on an emergency bill.

The clause found in section 7 of article 5, "this section shall not apply to emergency measures as referred to in section 1, of the article on the legislative department," has given me more concern than any other feature of the case. The point is raised by the use of the word *section* in this clause, it being contended that the construction must be according to the letter, that the qualification of the clause extends to the whole section, to all of the paragraphs into which it is divided, and is not to be confined to the matter which immediately precedes it. It is believed that the clause referred to is in legal effect a proviso, although it is not expressly so denominated. Technical language, however, is not absolutely essential to the creation of a proviso, although

it is customary to introduce one by the word "provided." It is the matter stated, and not its form, that determines its legal character. *Graves et al.* v. *Deterling et al.*, 120 N. Y. 447, 24 N. E. 656; *McKenzie* v. *Douglas County*, 81 Or. 442, 159 Pac. 625, 1033.

Black on Interpretation of Laws, paragraph 107, defines a proviso as follows:

"A proviso is a clause added to a statute or to a section or part thereof, which introduces a condition or limitation upon the operation of the enactment, or makes special provisions for cases excepted from the general provision of the law, or qualifies or restrains its generality, or excludes some possible ground for misinterpretation of its extent."

The rule for the construction of a proviso, and which has the support of many authorities, is that the language of a proviso in a section of a Constitution or statute shall be held to relate, not to the whole section, but only to the clause immediately preceding it, unless another purpose or intention on the part of the lawmaking body enacting it is plainly deducible from the enactment. In Black on Interpretation of Laws, section 110, it is said:

"The natural and appropriate office of a proviso to a statute or to a section thereof, is to restrain, to qualify, the provisions immediately preceding it; hence it is a rule of construction that it will be confined to that which directly precedes it, or to the section to which it is appended, unless it clearly appears that the legislature intended it to have a wider scope."

In section 186, Endlich's Interpretation of Statutes, it is said:

"Moreover, a proviso is always to be construed with reference to the immediately preceding parts of the clause to which it is attached, and limits only the passage to which it is appended, and not the whole section or act, or at least only the section in which it is incorporated."

In the case of *Wolf* v. *Bauereis*, 72 Md. 485, 8 L. R. A. 681, 19 Atl. 1047, Mr. Justice ALVEY, speaking for the supreme court of Maryland, said:

"It is said that the function of a proviso is that of limiting and qualifying the language of the statute, and not that of enlarging or extending the act or section of which it is a part; and that a proviso should always be construed with

reference to the immediately preceding parts of the clause or section to which it is attached. *Ex parte Webb*, 24 How. Pr. 247; *Kennsington* v. *Keith*, 2 Pa. 218; *Ex parte Partington*, 6 Q. B. 649, 653; Endlich's Interpretation of Statutes, par. 186.''

Now, in subdivision 3, section 1, part 1, of article 4, the framers of the Constitution had fixed the *quantum* of votes necessary to pass an emergency bill over the Governor's veto at three-fourths of the members elected to each house of the legislature, taken by roll-call of ayes and nays. In section 7 of article 5, and in a sentence immediately preceding the proviso, they provided for the passage of a bill over the objections of the Governor by a vote of two-thirds of the members elected to each house of the legislature, taken by roll-call of ayes and nays. Evidently, section 7 of article 5 is broad enough in terms to cover all bills, including emergency bills, for it begins with the statement: ''Every bill passed by the legislature. . . . '' It is believed that the clause referred to, and which in legal effect is a proviso, was adopted by the framers of the Constitution from excessive caution, and for the purpose of avoiding any apparent conflict or misunderstanding, and making it perfectly clear that the passage of an emergency bill over the Governor's veto must be had by a three-fourths vote of the members elected to each house of the legislature. So it seems to be clear that the case presents an instance for the application of the rule for the construction of a proviso, and that the clause referred to should be so construed here—to apply not to the whole section, but only to the matter which immediately precedes it. Had the intention been that it should apply to the whole section, it is believed that the proviso would have been placed in a different part of the section, and it would not have been placed where it is so as to indicate it to be an exception to, or qualification of, the matter which immediately precedes it. The juxtaposition of the clause is very significant.

The conclusion of the whole matter is that the provision found in subdivision 3, section 1, part 1, of article 4, '' . . . also approved by the Governor,'' does not necessarily mean that such approval must be in writing, and that the provision found in section 7 of article 5, in respect to the tacit or implied approval of a bill by the Governor, applies to an emergency bill.

If the foregoing views are sound and correct, it follows that Senate Bill No. 98 (chapter 160, Laws of Arizona 1919), embracing as it does an emergency section, and having been approved by the affirmative vote, except one, of every member elected to each house of the legislature, became operative and effective as an emergency law immediately upon its being filed in the office of the secretary of state, by the Governor, without objections.

I have expressed my views only because I believe that the parties interested in this action are entitled to the opinion of each one of the judges of this court upon the question involved. Expression of individual judicial views on a grave constitutional question is always permissible, often advisable, and is sometimes, seemingly, almost necessary. Individual shades of thought and lines of logic, leading to the same conclusion in which all the judges may concur, cannot easily, if at all, be indicated in an opinion written by one of the judges speaking for the court, and for these reasons I have added my views.

CUNNINGHAM, C. J. (Concurring).—I find so many good reasons supporting the law that I am constrained to state those that appeal to me with the greatest force. I do not wish to be understood as disagreeing with the reasons and arguments presented by the other members of the court. I am particularly agreeable to the proposition of sustaining the construction placed upon the constitutional provisions in question by the legislative and executive departments. I am of the opinion that this is a sufficient reason in any doubtful case to justify affirming such official construction.

I am convinced, for other reasons, that such construction by the legislative and executive departments is sound.

I now proceed to state my reasons for such opinion.

The bill in this case passed both houses of the legislature by the votes of two-thirds of the members elected to each house; a separate section stated why it was necessary for the immediate operation of the law; after its final passage by the legislature, it was, on the thirteenth day of March, 1919, presented to the Governor for his approval or disapproval, and the legislature on that date closed the session. The Governor, after consideration of the measure ten days (Sun-

days excepted); filed the same in the office of the secretary of state without objections.

The appellant claims that the bill was approved by the Governor whenever he filed it in the office of the Secretary of State without objections ten days after the close of the legislative session at which it passed; the appellee contends that the expression, "also approved by the Governor," means an affirmative approval by that officer, and that, as the bill is an emergency measure when presented to the Governor, his failure to approve it by signing it is fatal to the law. But it is urged by appellant that the following portion of section 7, article 5, Constitution, applies, to wit:

"If any bill be not returned within five days after it shall have been presented to the Governor (Sunday excepted) such bill shall become a law in like manner as if he had signed it, unless the legislature by its final adjournment prevents its return, in which case it shall be filed with his objections in the office of the Secretary of State within ten days after such adjournment (Sundays excepted) or become a law as provided in this Constitution. After the final action by the Governor, or following the adoption of a bill notwithstanding his objections, it shall be filed with the Secretary of State."

The appellee answers this contention and insists that all of section 7 of article 5 is expressly excluded from the enactment of emergency measures by the words of the section as follows: The last sentence of the first paragraph of section 7 reads: "This section shall not apply to emergency measures as referred to in section 1 of article on the legislative department." The contention of the appellee would be forcible if the sentence relied upon closed with the word "measures"; that is to say, if the sentence read as follows: "This section shall not apply to emergency measures." These words, however, are qualified by those that follow, to wit, "as referred to in section 1, Legislative Department." As a consequence, section 7 of article 5 does apply to emergency measures in all particulars other than the particulars referred to in section 1, Legislative Department, with respect to passing emergency measures. The steps required by section 1, subdivision 3, part 1, article 4 (Legislative Department), to complete the passage of an emergency measure, are made exceptions from the requirements necessary to regularly pass an ordinary law.

The regulations set forth in section 7, article 5, are to be observed in the passage of an ordinary bill, so the bill passed as an emergency measure is an exception and requires other and different procedure from that required for the passage of the ordinary bill.

These other and different regulations and proceedings so required to be observed in passing emergency measures are the things referred to in section 1, article 4, to which the words "as referred to" relate in the connection in which they are used in said sentence.

All regulations mentioned in section 7, article 5, other than those which conflict with the regulations of like nature specified in section 1, part 1, article 4, must be observed by the legislative department in the passage of all bills. The sentence must be understood as if it were worded as follows:

"This section shall not apply to (the passage of) emergency measures (in the particulars) specified in section 1 of the article (4) on the legislative department."

We must read subdivision 3, of section 1, part 1, article 4, as a proviso to section 7 of article 5, inserted in lieu of the sentence referring thereto. So arranged, section 7, article 5, reads as follows:

"Every bill passed by the Legislature, before it becomes a law, shall be presented to the Governor. If he approve, he shall sign it, and it shall become a law as provided in this Constitution. But if he disapprove, he shall return it, with his objections, to the house in which it originated, which shall enter the objections at large on the journal. If after reconsideration it again passes both houses by an aye and nay vote on roll call of two-thirds of the members elected to each house, it shall become a law as provided in this Constitution, notwithstanding the Governor's objections.

"Provided, that no such emergency measure shall be considered passed by the Legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each house of the Legislature, taken by roll-call of ayes and nays, and also approved by the Governor; and should such measure be vetoed by the Governor, it shall not become a law unless it shall be approved by the votes of three-fourths of the members elected

to each house of the Legislature, taken by roll-call of ayes and nays.

"If any bill be not returned within five days after it shall have been presented to the Governor (Sunday excepted) such bill shall become a law in like manner as if he had signed it, unless the Legislature by its final adjournment prevents its return, in which case it shall be filed with his objections in the office of the secretary of state within ten days after such adjournment (Sundays excepted) or become a law as provided in this Constitution. After the final action by the Governor, or following the adoption of a bill notwithstanding his objections, it shall be filed with the secretary of state.

"If any bill presented to the Governor contains several items of appropriations of money, he may object to one or more of such items while affirming other portions of the bill. In such case, he shall append to the bill at the time of signing it, a statement of the item or items which he declines to approve, together with his reasons therefor, and such item or items shall not take effect unless passed over the Governor's objections as in this section provided.

"The veto power of the Governor shall not extend to any bill passed by the Legislature and referred to the people for adoption or rejection."

When we thus quote the like provisions of section 1, part 1, article 4, referred to in section 7, article 5, we at once see the force of the expression "*as* referred to in section 1, Legislative Department." Section 7, article 5, does not apply to emergency measures except as to the particulars not prescribed by section 1, Legislative Department. The like things prescribed by section 1, Legislative Department, for the passage of emergency measures, are not supplanted by section 7, article 5, and in such respect section 7, article 5, does not apply to the passage of such measures in such particulars.

If section 7, article 5, does not apply to the enactment of emergency measures in any respect, as contended by the appellee, then certainly the Governor is not required to sign the bill; "if he approve it he shall sign it." Section 7, article 5, alone, expressly gives effect to the failure to return the bill without his signature. In such case it shall become a law "in like manner as if he had signed it." If the bill

is an emergency measure and section 7, article 5, does not apply in any manner, then the Governor's failure to sign as evidence of his approval is immaterial. His holding the bill without action thereon is immaterial; his positive disapproval with specific objections filed is the only act of the Governor in the enactment of emergency legislation which is required to be made of record. In the absence of the record of the Governor's disapproval accompanied by a statement of his objections, an emergency law found in the office of the secretary of state after the close of the legislative session, filed there by the Governor, would be deemed a law passed with due observance of the regulations of enactment.

While such construction may be authorized upon the theory of a strict construction, yet I think it is not the fair meaning to be given to the said provisions. I am of the opinion that the words "as referred to in section 1, Legislative Department," mean that in so far as section 1, Legislative Department, has prescribed the regulations necessary to pass emergency measures, such regulations shall control, whenever and wherever they come in conflict with section 7, article 5.

The language, "this section shall not apply to emergency measures as referred to in section 1, Legislative Department," so clearly means that the two sections shall be construed together and made to operate without conflict, that it is only necessary to determine the extent of section 1, article 4, by reading it into the section referring to it, and giving effect to section 7, article 5, over and above that which is carried in section 1, article 4.

We held, in *Allen* v. *State,* 14 Ariz. 458, 44 L. R. A. (N. S.) 468, 130 Pac. 1114, in effect, that courts have no power to go behind the final legislative record and declare an enrolled bill invalid as a law for the failure of the legislature to comply with some Constitutional provision regulating its passage. Such legislative record, if regular on its face, speaks a truth that the courts must accept and act upon. See, also, *Graves* v. *Alsap,* 1 Ariz. 274, 25 Pac. 836, and *Harwood* v. *Wentworth,* 4 Ariz. 378, 42 Pac. 1025, affirmed 162 U. S. 547, 4 L. Ed. 1069, 16 Sup. Ct. Rep. 890.

We may treat as settled law of this state, from said cases, that the enrolled acts of the legislative department found on file in the office of the Secretary of State, bearing evidence that such enrollments previous to the time when filed had

received final action thereon by the legislature, and thereupon were presented to the Governor, and by the Governor finally acted upon by filing with the Secretary of State without objections, that enrolled bills bearing such evidence of final action constitute the record of the law—the only competent evidence of the record of the laws passed by the legislature, to which the courts may give effect. Such record imparts absolute verity and cannot be impeached by evidence of less dignity. The question òf inquiry in such case is: Does a record of law exist in the office of the Secretary of State? The Secretary of State has printed the enrolled bill as chapter No. 160 and certified to it. See certificate of Session Laws 1919. Said record bears no evidence of the Governor's veto or disapproval with objections. It bears on its face, however, the certificate of the Secretary of State in the form prescribed by paragraph 44, Revised Statutes of Arizona, 1913, to the effect that the enrolled bill was held by the Governor ten days (Sundays excepted) after the legislature closed the session at which it was passed, and filed the same in the secretary's office as a law on the twenty-sixth day of March, 1919. We take notice that the legislative session finally adjourned on the thirteenth day of March, 1919. The bill was neither vetoed nor disapproved with the stated objections.

It is clearly a valid existing law, and as such became operative on the twenty-sixth day of March, 1919, the time when it was filed by the Governor without objection. When the Governor filed the bill in the office of the Secretary of State at the expiration of a period of ten days' consideration (Sundays excepted), and he returned no objections to it, such action of the Governor was the performance by that officer of his final duty with regard to the enactment of the bill into a law. The clear duty of the Governor in such cases is the approval or disapproval of every bill presented to him by the legislative assembly. He can take no middle course and refuse to act either way. This court must presume that every sworn public officer has done his duty until the contrary appears, and this presumption applies to the Governor.

Indulging this presumption, we are compelled to the conclusion that, when the Governor has filed the bill in the proper office at the expiration of his time for consideration,

that he filed it with his entire approval, unless the contrary appears.    The contrary does not appear on the face of the record of the law.

The court erred in refusing an order compelling the auditor to perform a plain legal duty and issue his warrant for the salary claimed.