**In re Robert Edmund WILSON, Jr.**

**No. 50439.**

Supreme Court of Missouri,

En Banc.

June 14, 1965.

Rehearing Denied July 12, 1965.

Joseph S. McDuffie, Charles R. Oldham, St. Louis, for respondent.

Walter M. Clark, Richard B. Dempsey, David S. Hemenway, St. Louis, for informants.

HENLEY, Judge.

This is an original disciplinary proceeding in this court based upon an information filed, with leave, by the Bar Committee of the Twenty-second Judicial Circuit on October 15, 1963, charging the respondent, Robert Edmund Wilson, Jr., a member of the Missouri Bar, with certain acts of misconduct. The prayer of the information is that he be disbarred. Prior to the filing of this information the procedural requirements of Rule 5.03 were complied with. (All references to rules and statutes are to Supreme Court Rules, V.A.M.R., and to RSMo 1959 and V.A.M.S., respectively.)

The information is in two counts. It charges respondent with violation of Rules 4.11, 4.29, 4.32 and 4.47, and Section 560.-156 (Stealing), in substance, as follows:

1. That while president of the Ferrier-Harris Home for the Aged, hereinafter referred to as The Home, a not-for-profit corporation and a United Fund Agency, between March 23 and November 16, 1961, inclusive, he wrongfully and unlawfully converted to his own use funds of The Home in the amount of $6,212.00; and,

2. That as a result of this conversion The Home did not have funds to pay, when due, federal withholding and social security taxes of its employees and thereby incurred interest and penalties in the amount of $325.70.

Respondent's answer admits that he is a member of the Bar with offices and residence in the Twenty-second Judicial Circuit, that he was president of The Home, and that The Home is a United Fund Agency, but he denies each and every other allegation of the information.

The issues being thus joined the court appointed the Honorable Richard J. Chamier as Special Commissioner with power, authority and duties prescribed by our rules. After a pre-hearing conference on May 15, and a full hearing on June 11 and 12, 1964, at both of which respondent was present with his counsel, the Commissioner filed his report containing findings of fact, conclusions of law, and his recommendation that respondent be permanently disbarred.

At the hearing respondent admitted taking and using money of The Home totalling approximately $6,212.00 for his own personal needs. He denies any acts of *professional* misconduct. That is to say, he contends that it is neither charged nor proved that his admitted acts arose out of an attorney-client relationship, or in connection with the practice of law; that he may not be disciplined for nonprofessional misconduct unless he has been convicted of a crime therefor involving moral turpitude; that for these reasons the informants did not have authority to institute these proceedings; that to discipline him for those acts would be to deny his constitutional rights.

Respondent, a lawyer in his early fifties, son of a lawyer turned minister, and partner of a lawyer with whom he attended law school and later married, was admitted to the Bar in 1947, after being graduated from Chicago Kent College of Law. As a young man in his teens, under the guidance of his father who owned and managed real

estate, he apparently acquired considerable experience in the management, maintenance and improvement of rental properties. This experience was added to in a somewhat minor way during his service in the Army in this country and overseas during World War Two. After his honorable discharge from the service, he acquired more experience in this field in St. Louis while managing properties of his father-in-law. All of this we could say prepared him for the satisfaction of what was, in the beginning at least, an altruistic desire to serve his community, but which, in the end, offered a temptation that led to his downfall.

In 1957, after a disastrous fire in a nursing home in Warrenton, it was determined that The Ferrier-Harris Home for the Aged did not meet the requirements of fire safety codes, and authorities were threatening to close it. At the behest of his wife, Margaret, who was then gratuitously serving as attorney for The Home, he, merely as an interested citizen, offered his services and experience in real estate management to The Home. He immediately undertook to secure needed additional funds for The Home from the United Fund Agency, and as a result of his efforts a sprinkler system was installed, stairways were enclosed and other improvements made. Later, in 1958, he was elected to the Board of Directors of The Home. In 1959, he was elected President of the Board and reelected in 1960 and 1961. During this period The Home was renovated and remodeled under his direction. It was changed from what has been described as a drab, dark, rat and roach-infested building to a pleasant habitat. The floors were covered, the walls and woodwork were painted an off-white, a new kitchen, a walk-in freezer, and an automatic laundry were installed, and janitor quarters provided. In the words of the Reverend Doctor Amos Ryce, a member of the Board during a part of respondent's tenure as president, respondent was "the best functional President we have ever had

at the Home", "he gave [The Home] an air of lightness and respectability", "when the tile was laid across the split-level type of floor he himself moved in to help lay it and supervise it", "he changed the decor of the dining room so that these people would feel like human beings and not thrown away", "he made it more of a homelike atmosphere * * *."

There is no doubt that respondent spent a great part of his productive hours at The Home, particularly during its renovation. There is evidence that he was at The Home twelve to fourteen hours a day over a period of several months. Presumably his law practice was affected by this absence from his office. He found himself in financial distress; foreclosure proceedings were begun against his real estate and his automobile was repossessed. We have recorded this account of his background and his service to The Home to put in perspective what unfolds later; not because they are particularly material to the issue of whether he should be disciplined. We note that he did not represent The Home as its attorney.

While president of the Board he wrote sixty-seven checks on two bank accounts of The Home payable to himself or to cash, cashed them and used the proceeds as his own. They were written and cashed between March 1 and November 15, 1961, in amounts varying between $25.00 and $98.75, and totaled $6,212.47. His method was to not describe the check on its stub but to leave it blank so that, we may infer, a cursory examination of the checkbook would not reveal his conversions. As The Home's cancelled checks were returned from the bank, he would, we may infer, remove these from the others so that they would not disclose his conversions. After the bookkeeper returned from maternity leave in September, 1961, she made a search for these checks missing from the bank statements but could not locate them. Later, after an audit in 1962, she found them in a closet on the third floor where, we may infer, they were secreted by respondent. Respondent

says that he did not intend to deprive The Home permanently of these funds; that his intent from the beginning was to repay The Home, probably out of a fee he was expecting from an estate he represented.

He has made restitution; a part was paid after disclosure of the shortage and the last payment was made, according to the Commissioner's report, after final submission of this proceeding to the Commissioner. Respondent testified that he had secured the approval of a Mr. Goodwin, acting director of The Home, to use this money, and that he had disclosed his conversions to the bookkeeper and Goodwin before it was discovered by the latter. This was disputed. The Commissioner found that he had not secured such approval; that he had not disclosed the conversions before their discovery by others; and, that the acting director did not have authority to approve respondent's acts. We have read the transcript. We agree with these findings of the Commissioner. There is a suggestion that some of the shortage was spent on Produce Row for food for The Home, but the Commissioner found that this is not supported by the facts. We agree. We note that a number of character witnesses, including lawyers and other members of the community, testified that respondent's reputation for truth, honesty and morals was good; that he is an able attorney, devoted to the interests of his clients. Two members of the Board of The Home testified in respondent's behalf as to his reputation and character. Both said that after the shortage was disclosed to them in December, 1961, "there was never any feeling that Mr. Wilson intended to permanently deprive The Home of the funds * * *." Of course none of the matters stated in this paragraph are material to the issue of whether respondent should be disciplined.

Out of his own mouth respondent convicts himself of stealing, to use a distasteful word.

The question squarely presented is whether this court may discipline one of its officers guilty of such misconduct, the acts of which were not committed in his capacity as a lawyer and for which, as a violation of the criminal laws, he has not been charged or convicted.

■ The Canons of Ethics of the Bar is embodied or codified in Rule 4. It is under this rule that respondent is charged, and it should be noted that he is not charged under § 484.190 providing for the suspension or removal of an attorney. Rule 4.11 provides: "* * * trust property coming into the possession of the lawyer * * * should not under any circumstances * * * be used by him"; Rule 4.29, that "* * * He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice"; Rule 4.32, that "* * * a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man. * * *." Particularly applicable here is Rule 4.47 providing that "A lawyer should always maintain his integrity; and shall not willfully commit any act against the interest of the public; nor shall he violate his duty to the courts or his clients; *nor shall he, by any misconduct, commit any offense against the laws of Missouri or the United States of America, which amounts to a crime involving acts done by him contrary to justice, honesty, modesty or good morals;* nor shall he be guilty of any other misconduct whereby, for the protection of the public and those charged with the administration of justice, he should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney." (Emphasis supplied.) The Canons of Ethics, adopted by this court as a Rule, have the same full force and effect as a decision of this court. State ex rel. Clark v. Shain, En Banc, 343 Mo. 542, 122 S.W.2d 882, 884.

■ The right and power to discipline an attorney, as one of its officers, is inherent in the court. In re Conner, 357 Mo. 270,

207 S.W.2d 492, 495 [2]. This power is not limited to those instances of misconduct wherein he has been employed, or has acted, in a professional capacity; but, on the contrary, this power may be exercised where his misconduct outside the scope of his professional relations shows him to be an unfit person to practice law. In re Williams, 233 Mo.App. 1174, 128 S.W.2d 1098, 1105 [4, 6, 8]; State ex rel. Clark, et al., v. Shain, En Banc, 353 Mo. 542, 122 S.W.2d 882; In re Conner, supra; In re Richards, 333 Mo. 907, 63 S.W.2d 672; 5 Am.Jur. pp. 426, 427, § 276; 7 Am.Jur.2d pp. 72, 73, § 44; 7 C.J.S. Attorney and Client § 24, pp. 762, 764.

■ The Williams case, supra, (128 S.W.2d 1098) had its beginning as an original proceeding in the Kansas City Court of Appeals as In re Williams, Mo.App., 113 S.W.2d 353. Here, the opinion of the Court of Appeals held (1) that the action to disbar Williams was based on § 11707 R.S.1929 (now § 484.190) which, it said, was controlling in disbarment proceedings, and, (2) that the court had no power to disbar an attorney for a crime based on acts outside the practice of law in the absence of his conviction or indictment therefor. This court, En Banc, in State ex rel. Clark, et al., v. Shain, supra, quashed that opinion as being in conflict with both In re Richards, supra, and the rules of this court, and further held that the action in Williams was not based on the statute but was based on the rules. It will be recalled that the Richards case was a disbarment proceeding in which the respondent was charged, in substance, with acting as a "go-between" of kidnappers and their victim for which services he was to be paid a fee out of the ransom money. This court said in Richards at l. c. 682 that it was not called upon to rule whether the respondent was acting in his professional capacity because he had admitted that in his answer and was bound by the admission. We now aver that obviously his acts as a "go-between" were not in his professional capacity, and were not a part

of the practice of law as defined by what is now § 484.010, or by any other known definition. The court held in the Richards case that statutory grounds for disbarment are not exclusive. In the Williams case the respondent was charged with both professional and nonprofessional misconduct, the more serious charges being based not on his activities as an attorney, but upon misconduct in relation to the discharge of his duties as a sheriff, and as a probate judge in the years before our constitution required that such judges be licensed to practice law. In the second opinion of the Kansas City Court of Appeals in In re Williams (233 Mo.App. 1174, 128 S.W.2d 1098) the respondent was disciplined for the charges of misconduct relating to his duties as a county official and that court said at l. c. 1105: "* * * a well recognized ground for disciplining an attorney is for misconduct amounting to moral delinquency whether such delinquency is in reference to professional or *non-professional* conduct." (Emphasis theirs.) Quoting with approval from texts, that court further said at l. c. 1105: " 'As proof of a good moral character is an indispensable requisite for admission to the Bar, the continued possession thereof is equally essential, and an attorney may be disbarred for misconduct, professional or nonprofessional, which shows that he has forfeited his claim thereto. But, in order to warrant the revocation of an attorney's license for want of a good moral character, his moral delinquencies must be such as to unfit him for the proper discharge of the trust reposed in him; thus, it must appear that he is lacking in common honesty, or veracity.' * * * '*Any conduct* on the part of an attorney evidencing his unfitness for the confidence and trust which attend the relation of attorney and client and the practice of law before the courts, *or showing such a lack of personal honesty or of good moral character as to render him unworthy of public confidence,* constitutes a ground for his disbarment.' 7 C.J.S. Attorney and Client, pages 733, 734, § 19. * * * 'To warrant the removal, however, the attor-

ney's character must be bad in such respects as to show that he is unsafe and unfit to be trusted with the powers of an attorney, as conduct which is merely discreditable to the attorney, but not dishonorable or criminal conduct, may not be ground for suspension or disbarment.' " (Emphasis supplied.) We reaffirm that the court has the inherent right and power to discipline one of its officers guilty of misconduct not committed in his capacity as a lawyer.

■ In a closely allied theory respondent contends that the Legislature has the power to limit the authority of the courts in disbarment proceedings and that where a statute enumerates causes for discipline a member of the Bar cannot be disciplined for any other cause. In this contention he is not on solid ground. The great weight of authority is that statutory grounds for disbarment are not exclusive. See: In re Richards, supra, 63 S.W.2d l. c. 678 [8] and cases there cited; State ex rel. Clark, et al., v. Shain, supra, 122 S.W.2d l. c. 884(3). In the Conner case (207 S.W.2d 492) this court said that while the General Assembly has power to legislate in aid, it has no power to enact a statute which will control, frustrate, limit or infringe upon the right of the Supreme Court to decide fully and finally who shall enjoy, and continue to enjoy, the privileges of an attorney. In quashing the first opinion of the Kansas City Court of Appeals in the Williams case (113 S.W.2d 353) this court said in State ex rel. Clark, et al., v. Shain, supra, at 122 S.W.2d l. c. 884, in words apropos here: "The opinion of the court of appeals proceeds on the theory that there is a controversy between the legislative and judicial departments over the disbarment of attorneys. There is no such controversy. It is stated in said opinion that the legislature, under the police power, may enact reasonable regulations with reference to the matter. It also is stated therein that said regulations are for the use of the courts in disbarment actions. Everyone agrees to these statements. However, the said opinion goes further and

rules that the court must utilize the statutory regulations. There is not a word in the statute tending to sustain this ruling as will appear in the course of this opinion. The correct rule is that the courts may utilize said regulations. If they do so, then said regulations are in aid of our jurisdiction to disbar and not a limitation on said jurisdiction. In re Richards, 333 Mo. 907, 63 S.W. 2d 672, 675. Undoubtedly the legislative department, under the police power, 'has a voice' in making rules with reference to disbarment. Clark v. Austin, 340 Mo. 467, 101 S.W.2d 977, 994. But the courts are not compelled to proceed under said rules. They may proceed solely under court rules relating to disbarment. If they do so, legislation under the police power is not a limitation on the exercise of the court's jurisdiction to disbar. Furthermore, the statute was not intended to be a limitation on the exercise of the court's jurisdiction in disbarment."

■ Continuing with his theory that the authority of the court to discipline one of its officers is not inherent and is limited to the causes mentioned in the statute, he contends that to discipline him would constitute a denial of due process and equal protection under the state and federal constitutions. Rule 5 provides due process and it was followed. If by denial of equal protection he means, as he indicates, that his continuance in the practice of law is a right of which he cannot be deprived, he is wrong. "There is no inherent right to continue in the practice of law, but rather it is a mere privilege which will be withdrawn when one proves himself unfit." In re Downs, Mo., 363 S.W.2d 679, 691 [6]. Also see: In re Conner, supra, 207 S.W.2d l. c. 499 [15].

The charges of the second count of the information have had little mention, primarily because they are incidental to the charges of count one and embody a charge constituting the result of the acts charged in the first count. We note count two and do not overlook it, but it is unimportant to the result in view of respondent's admission.

The Home is a public institution for the aged, supported in part by public subscription through the United Fund and in part by the aged residing there through their social security and old-age-assistance incomes. Respondent held a position of private trust and assumed a public duty as a member and president of the Board of The Home. No doubt his service was both gratifying and satisfying to him. Special trust and confidence was reposed in him not only because of his services to The Home but also because he was a member of a profession worthy of trust. It was his duty in these circumstances to uphold the honor and dignity of his profession by rigidly maintaining his personal integrity. Instead, he breached the trust reposed in him by The Home, its officers, and his community. In doing so he committed an offense against the laws of Missouri contrary to Rule 4.47. The facts compel that respondent be disciplined. The extent to which he should be disciplined has been given careful consideration. In this connection we are mindful that he has made restitution. But restitution is not a defense. In re Kohlmeyer, Mo., 327 S.W.2d 249, 252 [2] and cases there cited. Nor does respondent specifically contend that of itself restitution is a defense; rather, he argues it as a mitigating factor. We are mindful too of the testimony of members of the Board of which he was president and others as to his previous good reputation and moral character. This evidence cannot be used to justify or excuse the offense; rather it may be considered only to mitigate the gravity and consequences thereof. We are mindful too that the purpose of proceedings of this character is not to punish the attorney; instead, it is to protect the public and the integrity of the Bar, and to preserve the courts from the ministrations of persons unfit to serve therein as attorneys.

 In taking the money of those who trusted him respondent has failed to observe the elemental obligation of honesty. His retention as an officer of the court would be inimical to the public confidence and esteem essential to the courts and the Bar in the efficient administration of justice. He should be disbarred and his name stricken from the roll of attorneys. It is so ordered. The costs are taxed against respondent.

All concur.

WOLFE, Special Judge, concurs.