Donald G. ADAMS, Plaintiff-Appellee,

v.

Daniel WALKER, a/k/a Dan Walker, Individually and as Governor of the State of Illinois, Defendant-Appellant.

No. 73–1491.

United States Court of Appeals, Seventh Circuit.

Heard Dec. 10, 1973.

Decided Feb. 25, 1974.

See also, 7 Cir., 488 F.2d 1064.

William J. Scott, Atty. Gen., Herbert L. Caplan, Asst. Atty. Gen., Chicago, Ill., for defendant-appellant.

Richard A. Hollis, Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, a practicing lawyer, is the former chairman of the Illinois Liquor Control Commission. On May 4, 1972, former Governor Ogilvie appointed plaintiff to a term expiring on February 1, 1978. In January 1973, plaintiff refused to resign his part-time position as requested by representatives of Governor Walker. On February 1, 1973, Governor Walker sent the following letter to plaintiff:

"Pursuant to the constitutional powers vested in me as Governor of the State of Illinois, I hereby remove you, for cause and effective immediately, from your position as a member and as Chairman of the Illinois Liquor Control Commission."

On the same date, Governor Walker sent plaintiff the following telegram:

I hereby remove you, effective immediately, from your position as a member and as chairman of the Illinois Liquor Control Commission for incompetence, neglect of duty and malfeasance in office and other cause pursuant to the constitutional and statutory powers vested in me as Governor of the State of Illinois.

On February 2, 1973, Governor Walker appointed Elroy Sandquist, Jr., to succeed plaintiff as a member of the Commission and subsequently designated Lawrence E. Johnson as its chairman. In March 1973, plaintiff filed this action against Governor Walker, seeking reinstatement as a member and chairman of the Commission. Plaintiff also sought damages allegedly incurred as a result of his dismissal.

On April 2, 1973, the district court entered a temporary restraining order in plaintiff's favor and five weeks thereafter *sua sponte* issued a preliminary injunction. On May 31, 1973, the district court entered an order requiring defendant to show cause why he should not be held in contempt for disobeying the temporary restraining order and preliminary injunction. On the following day, defendant appealed from the issuance of the preliminary injunction. We reverse.

I.

Article V, Section 10, of the 1970 Illinois Constitution, S.H.A. provides:

"The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor."

A virtually identical provision in the 1870 State Constitution was construed by the Illinois Supreme Court as making "power of removal from office by the Governor co-extensive with his power of appointment." Wilcox v. The People ex rel. Lipe, 90 Ill. 186, 198 (1878).[1] The court expressly rejected the argument that notice and hearing were required, stating:

"Undoubtedly, the Governor can only remove for some one of the causes specified; but the removal here was for one of these causes—incompetency. The Governor ascertained the existence of the cause here, and made the removal on account of it. The constitution is silent as to who shall ascertain the cause of removal or the mode of its ascertainment. It simply gives to the Governor the power to remove any officer whom he may appoint, in case of incompetence, etc. It follows, then, that it is with the Governor, who is to act in the matter, to determine, himself, whether the cause of removal exists, from the best lights

1. This rule was reiterated in Ramsay v. VanMeter, 300 Ill. 193, 202, 133 N.E. 193, 196 (1921). Fiedler v. Eckfeldt, 335 Ill. 11, 23–24, 166 N.E. 504, 509 (1929) and People v. Deatherage, 401 Ill. 25, 31, 81 N.E.2d 581, 586 (1948), state in dicta that the Governor's decision to remove an officer is not subject to judicial review. See generally Braden and Cohn, The Illinois Constitution: An Annotated and Comparative Analysis, 285–287 (1969).

he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision. The constitution of this State not only declares that the powers of the government of the state shall be divided into three distinct departments, but has expressly prohibited the exercise of any of the powers properly belonging to one by either of the others." 90 Ill. at 204–205.

Plaintiff's argument for an alternative interpretation of the Illinois constitutional provision is essentially that the Illinois Supreme Court did not mean what it said. That court said in *Wilcox*, "We think the intention [of the 1870 Convention] was to adopt the rule which had become established under the Constitution of the United States with respect to appointments made by the President, * * * namely" the rule quoted above. Plaintiff contends that the true meaning of *Wilcox* is that Illinois will follow the federal rule, whatever it may be, and that the Illinois Supreme Court misunderstood the federal rule because it subsequently did not cite Shurtleff v. United States, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903).[2] Of course, the 1870 Convention could not possibly have intended to adopt the rule of a 1903 decision. More fundamentally, the federal rule announced in *Shurtleff* was that in the absence of a contrary constitutional or statutory provision, "the President can, by virtue of his general power of appointment remove an officer, even though appointed by and with the advice and consent of the Senate." 189 U.S. at 314–315, 23 S.Ct. at 536. This rule was held to be so well established that a statutory provision specifying grounds for removal did not by implication forbid the President to remove on other grounds. Instead the President retained an "unlimited power of removal." *Id.* at 317, 23 S.Ct. 535. Undoubtedly this was the federal rule cited by the Illinois court in *Wilcox*. The *Shurtleff* language relied on by plaintiff construed the Customs Administrative Act of 1890 as requiring notice and hearing if the President announced that he was removing appraisers for one of the grounds specified in the statute. *Id.* at 314, 23 S.Ct. 535. There is no indication that this construction was constitutionally compelled. Rather, the Court said that without a requirement of notice and hearing the statutory specification of grounds for removal would "fulfill no function." *Id.* at 317, 23 S.Ct. 535. As already noted, in *Wilcox* the Illinois Supreme Court has held squarely to the contrary in construing the Illinois Constitution, and its construction is binding on us.

*Wilcox* construed the removal provision of the 1870 Constitution, but it also controls the meaning of the corresponding provision of the 1970 Constitution. The two Sections are nearly identical, and it is clear that the 1970 Convention intended no change in meaning. The entire committee report on this Section read as follows:

"The only alteration made as this section is carried forward from its existing counterpart is the deletion of clearly superfluous language." VI Rec. of Proceedings 6th Ill.Const.Conv. 387 (hereafter cited —— Rec. ——) (Executive Comm. Proposal 1, p. 51).

During debate at first reading on the floor of the 1970 Convention, the meaning of the Section was explained by reference to earlier Illinois Supreme Court decisions. III Rec. 1324–1327 (Verbatim Transcript). The Section as passed at first reading was amended without explanation by the Committee on Style, Drafting and Submission. VI Rec. 432 (Style, etc. Comm. Proposal 6, p. 18).

2. See note 1, *supra.*

That Committee's report indicated that some changes were submitted without explanation because the reasons were "self-evident" (VI Rec. 415 (Style, etc. Comm. Proposal 6, p. 1)), and it is clear that the changes were purely stylistic. The Section as proposed by the Committee on Style was adopted without further debate (V Rec. 4753 (Index to Verbatim Transcript)) and is the Section before us. See also VII Rec. 2709 (Official Text With Explanation, p. 29).

## II.

██ Whether plaintiff has a right to a due process hearing before he can be dismissed is a matter of federal law. He has such a right if his dismissal infringes his liberty, or if, as a matter of state law, he has a property interest in the job. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570. The rule that plaintiff has no right to a hearing under state law is persuasive on the issue whether he has a property interest, but it cannot be conclusive. *Wilcox* was decided long before *Roth* and *Sindermann* and did not decide any question of property rights. Thus the law of Illinois could conceivably be that plaintiff has a property interest but no right to a hearing to protect that interest. Cf. Shirck v. Thomas, 486 F.2d 691, 692 (7th Cir. 1973).

██ Plaintiff argues that since he was appointed for a six-year term, he has a property right to hold the job for six years. He relies on Ill.Rev.Stats. ch. 43, § 98, which provides that liquor commissioners shall be appointed for periods of six years, and on a letter from then Governor Ogilvie appointing him, subject to Senate confirmation, "for a term expiring February 1, 1978." Plaintiff's commission makes no reference to a six-year term, but instead says that he is "To have and to hold the said office, with all the rights and emoluments thereto legally pertaining, until his successor shall be duly appointed and qualified to office."

"A term of employment set by contract has been recognized as a property interest which the state cannot extinguish without conforming to the dictates of procedural due process." Hostrop v. Board of Junior College District No. 515, 471 F.2d 488, 494 (7th Cir. 1972). The issue is whether the statute and letter referred to give rise to an implied contract for a six-year term, or to a "legitimate claim of entitlement" to such a term. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. As we understand Illinois law, they do not.

First, the provision for six-year terms must be read in light of the constitutional removal provision. It is reasonable to assume that had the legislature intended its provision for six-year terms to confer vested property rights on the office holder, it would have included specific language attempting to limit the Governor's power to remove without notice, hearing or right of review. This is particularly true since it is not at all clear that the legislature can, by statute, modify the constitutional removal provision, and the Illinois courts would construe an ambiguous statute so as to avoid constitutional doubt. Craig v. Peterson, 39 Ill.2d 191, 233 N.E.2d 345, 351 (1968). Second, although the legislature has enacted an elaborate Personnel Code giving civil service protection to many state employees (Ill.Rev.Stats. ch. 127, § 63b101 et seq. (1971)), it has specifically exempted "members of boards and commissions, and all other positions appointed by the Governor by and with the consent of the Senate." § 63b104c(7). Third, there is no allegation that plaintiff was unfamiliar with the Governor's removal power. Freedom from gubernatorial removal could not have been a claim upon which plaintiff relied in his daily life, so that there was no "legitimate claim of entitlement" to a full term. See *Roth*, 408 U.S., at 577, 92 S.Ct. 2701.

Fourth, the trial court's finding that the Illinois Senate would probably confirm plaintiff's successor is not consistent with a legislative intent to create a

property right not subject to the Governor's removal power.

Fifth, members of the Illinois Liquor Control Commission have substantial quasi-legislative and quasi-judicial responsibilities; in a very real sense they are vested with part of the sovereignty of the state. See Ill.Rev.Stats., ch. 43, § 97 et seq. The statute provides for only three liquor control commissioners. § 97. Unlike teachers and junior college presidents, they have no supervisors to guide their work; subject only to judicial review or statutory amendment, these three commissioners hold ultimate regulatory authority over the liquor industry in Illinois. The Commission's powers and duties include the power to hold hearings to determine whether liquor licensees have violated the law and to suspend or revoke the licenses of those found guilty. § 108(1). The Commission has rule-making authority (§ 108 (2)), which has been used to adopt substantive regulations. See Shoot v. Illinois Liquor Control Comm., 30 Ill.2d 570, 198 N.E.2d 497 (1964). In short, these commissioners do not merely implement policies formulated with reasonable specificity by others; they formulate the policy of the state.

While a state might give an individual property rights in such a sensitive position, it would be unusual if it did so. Even in the First Amendment area, we have recognized that political philosophy or affiliation may be relevant to the selection of policy-making officials. State Employees Council 34 v. Lewis, 473 F.2d 561, 574 (7th Cir. 1972); see also Gould v. Walker, 356 F.Supp. 421 (N.D.Ill.1973); cf. Pickering v. Board of Education, 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811. While the parameters of this exception to the normal protection given public employees have not been fully defined, and even though it would seem to be a small category (cf. Hostrop v. Board of Junior College Dist. No. 515, 471 F.2d 488 (7th Cir. 1972)), the considerations which justify the exception are certainly relevant here. Ultimate policy-making authority in Illi-

nois is retained by the people. Before we could determine that an individual had been ceded a property right in a policy-making position, we would expect a clear statement by the legislature or the Illinois courts. For example, Section 98 might have included a sentence along the following lines: "No commissioner shall be removed from office before the expiration of his term, except on a finding of [list of grounds for removal] after due notice and hearing." The six-year term provisions relied on by plaintiff are not such clear statements.

This conclusion does not render the six-year term meaningless. The legislature could have provided six-year staggered terms so that subject only to the Governor's removal power, there would always be experienced members on the Commission. Further, the limitation to six-year terms requires that the Governor periodically review the performance of each commissioner and determine whether to reappoint or replace him. It is not necessary in this case to determine exactly what the legislators had in mind. It is sufficient to conclude that they did not intend to create a property right.

### III

■ Nor did the dismissal infringe any liberty interest. The use of the talismanic phrase "incompetence, neglect of duty, and malfeasance in office" in effecting plaintiff's discharge was plainly to satisfy the state constitutional provision and did not take liberty without due process of law. General characterizations of behavior must be read in context. In Jeffries v. Turkey Run Consolidated School District, 492 F.2d 1 (7th Cir. 1974), plaintiff was charged with "highly unethical conduct." But the specification of that charge made clear that the School Board meant only that plaintiff had "openly contradict[ed] the directives given to students" by another teacher. We held that this statement did not deprive the plaintiff of liberty. Opinion at p. 2, n. 1. Similarly here, given the Governor's absolute dis-

cretion to dismiss his appointees, coupled with the requirement that he invoke the constitutional language, his statement means nothing more than if he had said, "I am dismissing you because I think I can find a better liquor commissioner." Proof that "nonretention in one job, taken alone, might make him somewhat less attractive to some other employees would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" Roth, 408 U.S. 574, n. 13, 92 S.Ct. 2708.

A careful reading of the passage in Roth under which plaintiff has attempted to plead a deprivation of liberty makes clear that the Court contemplated one of two quite different situations. The opinion suggests two distinct liberty interests which might be involved in a dismissal situation.

First, the Court said that notice and hearing are essential "where a person's good name, reputation, honor, or integrity is at stake" (408 U.S. at 573, 92 S.Ct. at 2707). The examples mentioned by the Court are charges of dishonesty and immorality. The cases cited involve charges of alcoholism (Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515); disloyalty (Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216; Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129); Communism (Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817) and subversive activities (United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252). The Court concludes with a reference to Cafeteria Workers Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230, where it was held that requiring surrender of an identification badge giving access to a Naval gun factory did not imply a charge of disloyalty.

In the next paragraph, the Court said a hearing might also be required if the state imposed on Roth "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707. The use of the word "stig-ma" is clarified by examination of the cases cited. The Court quotes the statement of Justice Jackson, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, that to be deprived "not only of present government employment but of future opportunity for it certainly is no small injury." 341 U.S. at 185, 71 S.Ct. at 655. The Court then cites a case striking down a statute limiting the percentage of aliens which any employer could hire. (Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131), and two cases in which states had denied petitioners admission to the bar, Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796; Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. This paragraph also concludes with a reference to Cafeteria Workers Local 473 v. McElroy, in which plaintiff had not been precluded from jobs at any other government installation or anywhere in the private economy. 367 U.S. at 898, 81 S.Ct. 1743.

There is some overlap between these categories, because foreclosure of other opportunities is often accompanied by serious charges. Thus in Suarez v. Weaver, 484 F.2d 678 (7th Cir. 1973), where a doctor was charged with activities which gave rise to an inference that he was violating the narcotics laws, and this information was sent to the state licensing authorities, elements of both liberty interests were at stake, and we found it unnecessary to treat them independently. But in Shirck v. Thomas, 486 F.2d 691 (7th Cir. 1973), and Lipp v. Board of Education, 470 F.2d 802 (7th Cir. 1972), we analyzed these interests separately before concluding that neither was infringed.

■ We are satisfied that plaintiff has failed to state a claim under either branch of the Roth liberty test. An unelaborated charge of "incompetence, neglect of duty and malfeasance in office" is of a different order of magnitude than charges of dishonesty, immorality, disloyalty, Communism, subversive activities, alcoholism or narcotics viola-

tions. The difference is especially significant in light of the interpretation which the Illinois Supreme Court has placed on those words in the removal provision of the Illinois Constitution. And nothing in the complaint even remotely suggests a legal barrier to future employment analogous to denial of admission to the bar, disqualification from all government employment, the alien limitation statute in Truax v. Raich, *supra*, or sending substantial adverse information to a professional licensing agency. The complaint does not allege any fear that this dismissal may lead to disbarment. In In re Lynch, 238 S.W.2d 118 (Ky.1951), where an attorney was disbarred for his misconduct as Alcoholic Beverage Administrator, the disbarment was based on a 250-page record showing embezzlement of public funds. Here, it is specifically alleged that there was no specification of "charges * * * acts, conduct or grounds" supporting the Governor's invocation of the magic words.[3]

This case is before us on appeal from a preliminary injunction, and no motion to dismiss appears in the certified record. However, since the complaint fails to state a claim on which relief can be granted, the injunction should not have been entered.[4]

Reversed and remanded with directions to vacate the May 18, 1973, preliminary injunction.

STEVENS, Circuit Judge (concurring).

Since I was a member of the panel which, on June 27, 1973, declined to vacate Judge Poos' preliminary injunction, and since, as Judge Pell correctly points out, the rationale of that decision is not consistent with our holding today, candor requires that I explain the change in my views.

Quite frankly, when the preliminary injunction question was first before us, I did not fully appreciate the impact of the Illinois Supreme Court decisions construing the scope of the Governor's removal power on the question whether a member of the Liquor Control Commission has a property interest in his job. I therefore incorrectly assumed that the legislative provision for a six-year term gave Adams such a property interest. On that premise, he could not have been removed without due process.

The question whether Adams had a property interest in his position as a member of the Liquor Control Commission is, of course, purely a question of Illinois law. It is not for us to appraise the wisdom of the State's choice between giving such a Commissioner fixed tenure, on the one hand, or making his employment terminable at the unfettered discretion of the Governor, on the other. It is simply our job to identify the choice that Illinois has made, and to respect that decision. As Judge Cummings has demonstrated, as a matter of Illinois law Adams could be removed whenever the Governor saw fit to recite the magic words, "incompetence, neglect of duty, or malfeasance in office." Adams was therefore not deprived of an interest in property within the meaning of the Fourteenth Amendment.[1]

---

3. The Governor's contemporaneous press statement that plaintiff was legally required to revoke eight liquor licenses of Western Concessions, Inc. instead of fining it for making political campaign contributions was clearly not libelous under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

4. Because of our holding that the complaint fails to state a claim upon which relief can be granted, it is unnecessary to decide other issues raised by defendant in this Court. It is also unnecessary to decide whether the rationale of New York Times v. Sullivan,

376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, requires that the right of public figures to a name-clearing hearing be substantially curtailed. Finally, we also leave open the question whether, if plaintiff's liberty had been infringed, he would be entitled to the relief granted below pending a name-clearing hearing. Cf. Garcia v. Daniel, 490 F.2d 290, at 292–293 (7th Cir. 1973).

1. The statutory provision of a six-year term certainly creates the impression that the Commissioner has a property interest in his position. The illusion is dispelled, however, by a federal analogy. The President might

The question whether the Governor has deprived Adams of his "liberty" within the meaning of the Fourteenth Amendment presents a different issue. I agree with Judge Cummings' analysis of that issue but would add two brief comments.

First, whether a word such as "malfeasance" creates the kind of stigma that concerned the Court in cases like *Constantineau*[2] may depend largely upon the context in which the word is used. If, for example, a finding of "malfeasance" disqualified a law school graduate from admission to practice, or resulted in the forfeiture of a prison inmate's good time credits, a liberty interest would be impaired. But if the term is used in a context in which important political figures routinely use uncomplimentary language about one another—a context in which First Amendment interests override a State's interest in enforcing its own law of defamation—it would be most anomalous to conclude that the subject of the robust comment has been deprived of an interest which at once is protected by the Fourteenth Amendment to the Federal Constitution but which the First Amendment prohibits the State from protecting.

Second, the fact that a policy decision by the Governor of a sovereign State is involved raises particularly difficult questions about the kind of procedure that would be required if an interest in liberty were impaired. Quite obviously, if the Due Process Clause does require a hearing, the purpose of that hearing and the standards to be applied in testing the Governor's action must be defined.[3] With respect to this kind of gubernatorial action, almost any form of hearing that I can envision either would be meaningless—nothing more than an opportunity to test the firmness of the Governor's prior decision—or else would involve an excessive invasion by the federal judiciary into the making of policy by the State.[4] These considerations buttress my conviction that Judge Cummings' analysis is not only sound legally, but also gives appropriate consideration to the respect which one sovereign owes to another in our federal system.

In sum, I agree completely with Judge Cummings' cogent analysis of the legal issues which are presented, and I concur in his opinion.

*PELL, Circuit Judge* (dissenting).

The majority opinion as I read it reaches the conclusion that a lawyer, possessing the same constitutional rights as other citizens,[1] who is summarily removed before the completion of his appointed term of office from a governmental position "vested with part of the

---

appoint, with the advice and consent of the Senate, an Attorney General, to serve for a period of four years. Such a four-year appointment, however, would not limit in any respect the Executive's unqualified power to remove a member of his cabinet at will. In effect, as I now understand the Illinois Constitution and statutes, a member of the Liquor Control Commission is comparable to a member of the Executive's cabinet, and, although appointed for a specific term, is nevertheless removable at will by the Governor. He therefore has no greater "property" interest in his job than does the Attorney General of the United States.

2. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515.

3. See Shirck v. Thomas, 447 F.2d 1025, 1028 (7th Cir. 1971) (dissenting opinion).

4. It is possible that a sort of "name-clearing hearing" would be desirable both to provide the Commissioner with an opportunity to explain his position and also to inform the public about an important issue. It is my impression, however, that it is the First Amendment, not the Fourteenth, which performs the office of keeping the channels of communication and public debate open.

1. Adapting the words of Mr. Justice Douglas in Spevack v. Klein, 385 U.S. 511, 516, 87 S.Ct. 625, 629, 17 L.Ed.2d 574 (1967):

"Lawyers are not excepted from the words ['nor shall any State deprive any person of . . . liberty, or property, without due process of law']; and we can imply no exception. Like the school teacher in Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and the policeman in Garrity v. New Jersey, [385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562], lawyers also enjoy first-class citizenship." [Footnote omitted.]

sovereignty of the state," and who is told by the chief executive of the state that his removal is, *inter alia,* because of malfeasance in office is somehow less stigmatized than is an adult resident of Hartford, Wisconsin, whose inability to hold her liquor[2] is the subject of a public notice. I cannot agree with the reasoning or result of the majority opinion and therefore respectfully dissent.

As an initial matter it is noted that what we have before us for decision is whether the district court properly granted a preliminary injunction. It is well established that in reviewing a preliminary injunction, the appellate court does not substitute its opinion for the trial court's decision as to whether the injunction should have been granted. The review is of the trial court's exercise of its discretion, not a retrial of the case. United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936).

"[O]ur function in reviewing the entry of a preliminary injunction is a limited one . . . . The circumstances under which motions for preliminary injunction are made and heard illustrate the reasons for the narrow scope of review. The district judge is typically presented with an abbreviated set of facts, 'requiring a delicate balancing of the probabilities of ultimate success at the final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief' . . . . Absent a clear abuse of discretion, the normal course of wisely committing this balancing process to the district judge will not be disturbed." Scherr v. Volpe, 466 F.2d 1027, 1030 (7th Cir. 1972).

The majority opinion, holding that the complaint as a matter of law fails to state a claim upon which relief can be granted, does not treat the appeal from the point of view of abuse of discretion. Yet, when the present case was before this court on the defendant's motion for a stay pending appeal, a panel of this court on the basis of the case as then presented unanimously denied the stay because Governor Walker had not made the requisite substantial showing of probable success on his appeal. Adams v. Walker, 488 F.2d 1064 (7th Cir. 1973). We stated there:

"While the appellant was entitled under Article 5, § 10 of the Illinois Constitution to remove the appellee for incompetence, neglect of duty, or malfeasance in office, it has not been demonstrated to us thus far in the case of appellee who held his office for a six year term pursuant to Chap. 43, § 98, Ill.Rev.Stat., that he was not entitled to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution as a part of the removal. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed. 548 (1972). Fiat does not meet the standard and thus far nothing has been demonstrated to us regarding even a pretext of due process. The conclusory language of the discharge telegram merely repeating the wording of the Illinois constitutional provision with the added ambiguous 'and other cause' is certainly not sufficient for due process requirements." *Id.,* 488 F.2d at 1065.

Notwithstanding the foregoing, we disclaimed expressing any opinion on the ultimate merits of the appeal. I turn then to those merits as presented on full briefing and oral argument and as discussed in the majority opinion.

I deem it unnecessary to spend much attention on Wilcox v. People ex rel. Lipe, 90 Ill. 186 (1878), and its progeny as a complete bar to plaintiff's action since the majority opinion appears to concede that whether the plaintiff has a right to a due process hearing before he can be dismissed is a matter of federal law and that he does have such a right if his dismissal infringed his liberty, or if, as a matter of state law, he has a property interest in the job, citing

---

2. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed. 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972).

In my opinion, there was such a substantial infringement of liberty here without a vestige of due process that we need look no further than this prong to affirm the grant of a preliminary injunction. Nevertheless, because it also appears to me that Adams did have a property interest in his position, I will advert to that aspect of the case also.

The only significant obstacle to the appellee's claim of a property right lies in the *Wilcox* line of cases, which the appellant in effect contends establishes a virtual gubernatorial velleity for removing appointed officials. I read something other than constitutional approval of whim as a basis for removal in these cases.

First of all, if we treat the Illinois cases as establishing that the power of removal is co-extensive with the power of appointment, the appointment power under the statute was not at will but for a specified period of six years. A power of removal at will would not be co-extensive with the power to appoint for a six year term but would seem to be a substantially greater power. On the other hand, if the controlling statute had been in terms of an appointment without specifying the term of the office, removal at will would appear to equate with or be co-extensive with the power of appointment.

Secondly, the *Wilcox* court recognized that "[u]ndoubtedly, the Governor can only remove for some one of the causes specified [in the state constitution]." In the present case, the Governor not only threw the whole constitutional book at the appellee but for good measure tossed in an unspecified "other cause." To the extent that the "other cause" was the basis for the discharge, it, of course, goes beyond the *Wilcox* authorization for removal.

*Wilcox* can be read, as apparently the majority opinion does, as concluding that once the magic words "incompetence, neglect of duty or malfeasance in office" are uttered that ends the matter. I find this a flimsy bootstrap for saying that the legislature of the state of Illinois cannot provide a specific term of office, thereby creating a property interest, for any official who is appointed to office by the executive department.

As the majority opinion in the present case notes, the appellant relies, and justifiably so in my opinion, on Shurtleff v. United States, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903), in which the Supreme Court enunciated what the majority opinion apparently deems to be only a federal rule:

"There is, of course, no doubt of the power of Congress to create such an office as is provided for in the above section. Under the provision that the officer might be removed from office at any time for inefficiency, neglect of duty, or malfeasance in office, we are of opinion that if the removal is sought to be made for those causes, or either of them, the officer is entitled to notice and a hearing. Reagan v. United States, 182 U.S. 419, 425, 21 S.Ct. 845, 46 L.Ed. 1162, 1164. In speaking of causes of removal, Mr. Chief Justice Fuller said in that case:

'The inquiry is, therefore, whether there were any causes of removal prescribed by law March 1, 1895, or at the time of the removal. If there were, then the rule would apply that where causes of removal are specified by constitution or statute, *as also where the term of office is for a fixed period,* notice and hearing are essential. If there were not, the appointing power could remove at pleasure or for such cause as it deemed sufficient.'

"Various state courts have also held that, where an officer may be removed for certain causes, he is entitled to notice and a hearing. See Dullam v. Willson, 53 Mich. 392, 401, 19 N.W. 112, 51 Am.Rep. 128; Page v. Hardin (8 B.Mon.) 47 Ky. 668, 672; Willard's Appeal, 4 R.I. 597; Com. ex

rel. Bowman v. Slifer, 25 Pa. 23, 28, 64 Am.Dec. 680; State ex rel. Atty. Gen. v. Hawkins, 44 Ohio St. 98, 114, 5 N.E. 228; Biggs v. McBride, 17 Or. 640, 650, 21 P. 878, 5 L.R.A. 115; Ham v. Boston Bd. of Police, 142 Mass. 90, 7 N.E. 540." 189 U.S. at 313–14, 23 S.Ct. at 536 (emphasis added).

*Shurtleff* has a several pronged applicability to the present case. The statute there did not require notice and hearing. That seems clearly to have been read in as a matter of due process where one of the specified grounds for removal was utilized. Recognition is afforded in the quoted portion from the *Reagan* case of the essentiality of notice and hearing where a fixed period term is involved, again presumably because of due process requirements. Finally, *Shurtleff*. makes it clear that the *Wilcox* rationale that the power of the Illinois Governor to remove is the same as that of the President of the United States is a misconception of the power of the latter executive. In *Shurtleff,* the Court held that while due process notice and hearing were required where one of the constitutional or statutory grounds for removal was utilized, the President's power was not limited to the grounds specified, and notice and hearing were not required so long as the President did not purport to premise the removal upon one of the specified grounds. In the present case, Governor Walker did squarely rest the removal upon all three of the specified grounds as well as the unspecified "other cause." I am unaware of any difference in this context between federal due process and that which is applicable under the Fourteenth Amendment.

I recognize that I have been speaking in terms of due process while addressing myself to the matter of property rights and that the majority opinion appears to recognize due process requirements would flow from the existence of property rights, but I do not believe the two can be separated. The pertinent sections of the Illinois statutes read as follows:

"*97. Illinois Liquor Control Commission created.*] § 1. There is hereby created an Illinois Liquor Control Commission consisting of three (3) members to be appointed by the Governor with the advice and consent of the Senate, no more than two (2) of whom shall be members of the same political party. As amended [by act approved] June 6, Laws 1951. L. 1951, p. 263.

"*98. Appointment — Terms — Vacancies*]. § 2. Immediately, or soon as may be after the effective date of this Act [1934], the Goevrnor shall appoint three (3) members of the commission, one of whom shall be designated as 'Chairman', one to hold office for a period of two (2) years, one to hold office for a period of four (4) years, one to hold office for a period of six (6) years, and at the expiration of the term of any such commissioner the Governor shall reappoint said commissioner or appoint a successor of said commissioner for a period of six (6) years. The Governor shall have power to fill vacancies in the office of any commissioner." Ill.Rev.Stats. ch. 43.

The statutory words "to hold office for a period of six (6) years" are meaningless if an appointee can be removed at will, which, of course, is the situation if, *sans* notice and hearing, the uttering of the incantatory, and apparently imprecatory, words is all that is required to immolate the balance of a term of office.

Turning to the analysis of the property issue in the majority opinion, I ·can scarcely conceive that the legislature would have needed to buttress the plain meaning of § 98 that a six-year term was meant. No rule of statutory construction requires the additional statement "and furthermore we mean what we just said" when the meaning of the words is clear. The majority opinion suggests wording that the legislature might have used to make it even clearer that they meant what they had said. The vast extent of litigation in this area

arises from the fact that the constitutional requirement of notice and hearing was not in statutes but had to be read in by the courts. Of course, in any event, as the majority opinion reads *Wilcox* the additionally suggested words would have had no more efficacy than the present constitutional provision. The fact remains that the legislature purported to create a fixed period of six years, in which case "notice and hearing are essential," *Shurtleff, supra.*

Also, there is no contention in this litigation that the position is any type of civil service job, and very properly it would not be included in the ramifications of the Personnel Code, dealing as that does with career employees selected and tenured on the basis of merit and fitness.[3] We are not concerned here with what the subjective thoughts of the appellee may have been at the time of the acceptance of the appointment but rather with what in law the Governor's power of removal was.

Further, I find no significance in the trial judge's finding that the Illinois Senate would probably confirm plaintiff's successor. As I read this, all that was meant was that because of the time element under the Illinois Constitution a nomination sent to the Senate automatically is deemed to have been confirmed upon the lapse of a specified number of days. Even if the Senate by affirmative vote had confirmed a successor, this at most would have implied that the members of that body thought the position was vacant. In the absence of some showing that the Senators were aware of the circumstances of the purported removal, we do not even have the 1973 Senate rendering an advisory interpretation of a statute passed by a different General Assembly. With the addition of

the negative factor of nonaction involved in automatic confirmation by lapse of time, I fail to see how this reference to the trial judge's finding throws any discernible illumination on the intention of the legislature in enacting §§ 97 and 98 of chapter 43.

Finally, the majority opinion indicates that because of the importance of the position it would be unusual for the legislature to accord property rights therein. This seems to be a policy argument which the legislature chose not to follow. If we were involved in determining policy, which we are not, we would want to note that the Commission is a bipartisan one, and it may well be that the legislature in its wisdom preferred that the Commissioners not necessarily be the handmaidens of the incumbent Governor. In sum, I cannot agree that the legislature did not intend to create a property right.

Whether or not a property right was involved, I can see no basis whatsoever on the facts of the present case for characterizing the peremptory removal of the appellee as being other than an unconstitutional invasion of protected liberty under the standard recognized in *Roth, supra,* that where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. 408 U.S. at 573, 92 S.Ct. at 2701.

It would not seem necessary to determine whether the charges of incompetency or neglect of duty are such stigmas as to invoke *Roth's* liberty protection; the charge of malfeasance in office is sufficient. This term has not lacked judicial fleshing. A few examples should suffice to demonstrate that this characterization is indeed one of op-

---

3. This obviously is not intended to suggest that persons holding positions exempted from the Personnel Code coverage are not possessed of merit or fitness. Many of the exempted positions are for definite terms which renders questionable the conclusion that being exempt from the Personnel Code indicates that the person holding the position is removable at will. Thus, for example, the Governor as an elected officer is also exempt from the Personnel Code. The same is true of some fifteen categories of positions involved in the operation of the state governmental processes. Ill.Rev.Stats. ch. 127, § 63b104c.

probrium. This, and perhaps it needs not saying, is particularly true in today's climate of fading credibility in which the legal profession often seems to find itself.

"Malfeasance consists of the doing of an act which is wholly wrongful and unlawful; it involves an act which the officer has no authority to do. Malfeasance in office cannot be charged except for breach of a positive statutory duty or for the performance of a discretionary act with an improper or corrupt motive." People v. Schneider, 292 P.2d 982, 985, 133 Colo. 173 (1956).

"Malfeasance has reference to evil conduct or an illegal deed, the doing of that which one ought not to do, the performance of an act by an officer in his official capacity that is wholly illegal and wrongful, which he has no right to perform or which he has contracted not to do." State ex rel. Hardie v. Coleman, 155 So. 129, 132, 115 Fla. 119 (1934).

"[Malfeasance is an act] done with a corrupt purpose, or from a corrupt motive, or with a knowledge by the officer at the time that his official act is a violation of the law, or . . . done so negligently or carelessly or recklessly as to show an utter want of care or of concern, and such as would be tantamount to a fraud . . . ." Commonwealth v. Wood, 76 S.W. 842, 843, 116 Ky. 748, (1903).

"Malfeasance means evil doing, the doing of an act which is wholly wrongful and unlawful." State v. Langley, 323 P.2d 301, 309–310, 214 Or. 445 (1958).

"Malfeasance in office is generally defined to be the wrongful or unjust doing of some official act which the doer has no right to perform, accompanied by some evil intent or motive." State v. Wallace, 214 A.2d 886, 890 (Del.1963).

Earlier, reference was made to today's climate of lawyer credibility. Bar associations not unmindful of this situation have sought to strengthen their own housekeeping practices. Thus, in recent years the American Bar Association and many local bar associations have adopted codes of professional responsibility. A. B.A. Disciplinary Rule 1–102(A)(6) provides that a lawyer shall not "[e]ngage in any other conduct that adversely reflects on his fitness to practice law."

If the contention should here be made that the appellee was not practicing law at the time he was serving as a member of the Liquor Control Commission, aside from the fact that many lawyers as a part of their professional careers have engaged in public office service, it seems clear that conduct adversely reflecting on fitness to practice is not confined to practice per se.

Thus, in the case of In re Wilson, 391 S.W.2d 914 (Mo.1965), the Supreme Court of Missouri, after observing that the right and power to discipline an attorney is inherent in the court, noted, at 918:

"This power is not limited to those instances of misconduct wherein he has been employed, or has acted, in a professional capacity; but, on the contrary, this power may be exercised where his misconduct outside the scope of his professional relations shows him to be an unfit person to practice law."

In the same case, the court quoted approvingly from an earlier Missouri case in which the respondent had been disciplined for charges of misconduct relating to his duties as a county official to the effect that just as proof of a good moral character is an indispensable requisite for admission to the bar, the continued possession thereof is equally essential.

The following passage would afford small comfort to a person who has been the subject of removal from office based in part at least on a charge of malfeasance in office:

"While a conviction provides, perhaps, the clearest grounds for disbar-

ment, many actions for which society has not imposed criminal sanctions may indicate the attorney's unfitness to practice.

"It makes no difference in determining fitness for continued practice that an act involving moral turpitude, dishonesty, or corruption was not committed while serving as an attorney. That at the time of the questioned act a member of the bar was serving as a trustee, sheriff, liquor commissioner, judge, broker, notary or detective in a coroner's office is no defense to a disbarment proceeding. It is not enough to be honest in practice; the attorney must exhibit good character in every form of activity and in any capacity in which he may be acting." Note, 43 Cornell L.Q. 489, 491–92 (1958) (footnotes omitted).

The text reference to a liquor commissioner was based on In re Lynch, 238 S. W.2d 118 (Ky.1951). In that case, the court rejected the necessity of a practice nexus stating:

"It is lastly argued that Lynch's conduct was not connected with his professional duties, and he did not plead guilty to a criminal offense in confessing a fine for misfeasance in office, which facts should be taken into consideration in fixing the punishment. It is not necessary that the misconduct of an attorney be connected with his professional acts to bring about his disbarment. 5 Am.Jur. 'Attorney at Law', § 276, p. 426. As was said in Underwood v. Com., 105 S.W. 151, 32 Ky.Law Rep. 32, a certificate of good character is a prerequisite for admission to the Bar and the continuous possession of a good character is essential to continue as a member thereof. The Underwood opinion further states it is not neces-

sary that an attorney's conduct be such as would render him liable to a criminal prosecution in order to disbar him. If his conduct, although outside his professional dealings, shows him to be unworthy of confidence, he may be disbarred."

It seems clear to me on the basis of the foregoing authorities concerning the legal impact of a charge of malfeasance in office combined with today's emphasis on ethical propriety on the part of lawyers that the possibility of disciplinary proceedings directed toward a person who has been removed from public office on a charge of malfeasance in that office is no vague or idle threat but is a real and distinct potentiality. It may well be that Adams, if subjected to disciplinary proceedings, could successfully defend against charges based on the malfeasance accusation even though it is strengthened here by actual removal. The simple answer to this is he should not be exposed to this possibility in the absence of a due process determination of the validity of the charge.

Nor is it any answer to say that the complaint does not allege fear of disbarment. The seriousness of the charge of malfeasance in office as established by a legion of cases, only a few of which have been cited herein, is such that the exact potential impact of the stigma on a lawyer's professional career scarcely needs spelling out. Adams, of couse, did not even have the consolation afforded Lynch (In re Lynch, *supra*) of knowledge of specificity of acts going to make up the stigmatic cloud.[4] More importantly, those having to do with disciplinary matters would not here have the benefit of that knowledge.

The words of Mr. Justice Douglas in Wisconsin v. Constantineau, *supra*, are particularly apt. "This appellee was not

---

4. The majority opinion, also citing In re Lynch, apparently intends to distinguish it from the present case, although both cases involve liquor commissioners, because Lynch's "misfeasance in office" was known to be more egregious than the nonspecific "malfeasance in office" of Adams. *Lynch,*

however, was not cited in the dissent as an identical factual situation. It is pertinent, however, on the point for which it was cited, namely, that a lawyer may be subject to disciplinary procedures arising out of conduct other than the direct practice of law.

afforded a chance to defend [himself. He] may have been the victim of an official's caprice. Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." 400 U.S. at 437, 91 S.Ct. at 510.

I do not conceive it to be necessary to determine the order or magnitude or the relative stigmatic impact of the charge of malfeasance in office as contrasted with being dishonest, alcoholic, immoral, disloyal, Communistic, et cetera. Each "unsavory label" carries its own brand of stigma and, as the cases cited above indicate, the mark made by "malfeasance in office" is not inconsiderable. Nor do I think as a practical matter that the sting is lessened by the *Wilcox* line of cases, which basically does not hold that these terms are not stigmatic but merely that the courts will not disturb nor examine the gubernatorial decision that the status exists. However, and to repeat, the majority opinion does not disagree that if a property right or an invasion of liberty exists the federal courts will examine to see if there has been due process. I am inclined to think that the Illinois courts would also.

One other aspect of this type of case to which no reference was made in the majority opinion but which should not be ignored is whether the stigmatic charge was made in such a manner as to have a public impact upon the one charged. In the present case we do not have a confidential communication known only to the parties to this lawsuit. The complaint alleges that the general public was informed of the charges through press conferences and news releases. Attached to the complaint is one example of the result of the alleged publicity. In an article in the Chicago Tribune of February 2, 1973, reporting the removal of Adams, the following appeared: "Asked whether Adams was removed for incompetence, neglect, or malfeasance, Walker's press secretary, Norton Kay, replied: 'All three.'"

The record shows that Governor Walker had purported to name a successor to the position in question and that this purported appointment could arguably become effective under Illinois law automatically by lapse of time without the necessity of legislative confirmation. Loss of salary and position amply supports a claim of irreparable harm. I do not find that the granting of a preliminary injunction, and that is what we are concerned with here, to be an abuse of discretion.

Other points are raised by the appellant. Because of the disposition reached by the majority opinion these points were not treated. I find no merit, however, in the other contentions.

The principal additional contentions are that suit is barred by the Eleventh Amendment and that 42 U.S.C. § 1983 is not available to the plaintiff because the Governor's action was taken pursuant to the state constitution which is not statute, ordinance, regulation, custom, or usage.

As to the first of these contentions, while Adams did seek monetary damages, we are here concerned only with the injunctive phase of the litigation. This was not a suit against the state of Illinois but against an individual officer of that state. In my opinion the applicable law was correctly stated by Judge Holloway in the Tenth Circuit:

"Insofar as the claims for injunctive and declaratory relief are concerned, the principles are well established. 'It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the state within the meaning of that amendment.' Smyth v. Ames, 18 S.Ct. 418, 422, 169 U.S. 466, 518, 42 L.Ed. 819; see also Ex parte Young, 209 U.S. 123, 155–156, 28 S.Ct. 441, 52 L.Ed. 714; Larson v. Domestic & Foreign Corporation, 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628; McCoy v. Louisiana State

Board of Education, 332 F.2d 915 (5th Cir.); and School Board of City of Charlottesville, Va. v. Allen, 240 F. 2d 59, 62–63 (4th Cir.). And if the plaintiffs establish a violation of Federal constitutional rights and entitlement to relief under the Federal civil rights acts, the Wyoming Constitution may not immunize the defendants and override the Federal constitutional principles in view of the Supremacy Clause. Therefore, if a violation of Federal constitutional rights is established by plaintiffs, the immunity under the Eleventh Amendment and the Wyoming Constitution would not bar injunctive or declaratory relief against the defendants other than the State of Wyoming. McCoy v. Louisiana State Board of Education, supra, and Dorsey v. State Athletic Commission, 168 F.Supp. 149 (E.D.La.), aff'd 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028. And the Federal Court would have jurisdiction to grant such relief, even though the claim for money damages is barred by the immunity, as we discuss below. See Hopkins v. Clemson Agricultural College, 221 U.S. 636, 649, 31 S.Ct. 654, 55 L.Ed. 890." Williams v. Eaton, 443 F.2d 422, 428–429 (10th Cir. 1971).

I express no opinion as to whether Adams can recover monetary damages.

As to the applicability of § 1983, as long ago as 1903, Mr. Justice Holmes, while conceding that a forceful argument might be made that "statute, ordinance, regulation, custom, or usage" did not extend to a deprivation of rights under color of a state constitution, nevertheless assumed in disposing of a case that the statute did so extend. Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 48 L. Ed. 909 (1903).[5] Further, in the present case, a forceful argument based on *Wilcox, supra*, could be made that the deprivation was founded on "custom" or

"usage." See Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L. Ed.2d 213 (1970).

For the reasons set forth herein, I would affirm the action of the district court in granting the preliminary injunction.

---

5. In any event, in more recent treatment, the Supreme Court has stated: "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed. 2d 267 n. 7 (1966).