[Civ. No. 39603. First Dist., Div. Four. Apr. 11, 1977.]

DONALD GARNEL et al., Plaintiffs and Appellants, v.
JOHN H. BUNZEL, as President, etc., et al.,
Defendants and Respondents.

COUNSEL

Greene, Kelley & Tobriner and Sheldon L. Greene for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Richard L. Mayers, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**CHRISTIAN, J.**—Five members of the economics faculty of San Jose State University sued the university president, and other officials, seeking a writ of mandate and injunctive and declaratory relief to overturn a decision of the president excluding the economics department from participation in certain consultative procedures relating to academic matters. The trial court sustained demurrers to the first and second causes of action; a bench trial on the third cause of action resulted in a judgment for the defendants; the plaintiffs appealed.

In April of 1974, the university promotions committee of San Jose State University recommended to the president of the university that the department of economics should be excluded from participation in personnel review functions; apparently the recommendation was based on a determination that department members had improperly blocked the promotion of a colleague. Upon receiving this recommendation, the administration requested the social sciences policy committee, composed of department chairmen, to form a committee of inquiry to investigate whether the economics department was in fact unable to conduct properly its self-governance functions. Appellants received a copy of the memorandum from Academic Vice-President Hobart Burns, asking the school of social sciences review committee (hereinafter the factfinding committee) to perform the investigation. Pursuant to the university's rules of confidentiality, the factfinding committee met in closed session. It heard witnesses and reviewed evidence. The committee also invited appellants to submit written statements; each of the appellants did submit a written statement.

The factfinding committee prepared a written report summarizing the factual basis for its recommendation. The recommendation was that the department of economics be "disenfranchised" and that the customary faculty functions with respect to academic governance be assigned for an indefinite period to an appointed executive committee.

In light of the recommendations of both the university policy committee and the school of social sciences' factfinding committee, as

well as the history of difficulties within the department, the president of the university placed the department of economics "in receivership," indefinitely suspending ("for more than a year or two") the normal participation of the department of economics' faculty in all personnel and policy activities of the department. The president directed that the customary functions of the departmental faculty be performed by an executive committee composed of six senior faculty members from other departments, working under the chairmanship of the chairman of the economics department.

The academic senate by resolution requested reinstatement of the consultative right of the department of economics and criticized the president's method of action. The president replied with a lengthy explanation which, together with the school of social sciences' factfinding committee report, was distributed to the entire faculty. The so-called "disenfranchisement" attracted attention in the campus newspaper, was discussed in an editorial in the Wall Street Journal, and was mentioned in an article in the business section of the New York Times.

Following the disenfranchisement, appellants filed individual but essentially identical grievances under procedures which had been established by the chancellor of the state university system for handling individual grievances of faculty members. In one case, the faculty grievance committee held that the complainant was seeking redress for alleged wrongs against the entire academic department and not for individual wrongs and that, therefore, such a claim did not constitute a proper subject for grievance hearings. In other hearings, the faculty grievance committee found that the president had acted properly and prudently, and the grievances were denied. The present litigation followed.

The appeal involves two contentions: (1) that the president's action in placing the department of economics in receivership seriously damaged appellants' professional reputations, depriving them of a "liberty" interest without due process of law, and (2) that appellants' consultative rights constituted a "property" interest and that they were deprived of that interest without due process of law.

■ The protections of due process apply only to interests coming within the "property" and "liberty" rights as those terms are used in the Fourteenth Amendment. (*Perry* v. *Sindermann* (1972) 408 U.S. 593 [33

L.Ed.2d 570, 92 S.Ct. 2694]; *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701]; *Abeyta* v. *Town of Taos* (10th Cir. 1974) 499 F.2d 323, 327.) In *Board of Regents* v. *Roth, supra,* 408 U.S. at page 573 [33 L.Ed.2d at pages 558-559], the court stated that where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, his interest in liberty is implicated and due process protections come into play. (See *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 437 [27 L.Ed.2d 515, 519, 91 S.Ct. 507].)

■ The evidence in the present case, however, well supports the trial court's determination that appellants failed to bring themselves within the criteria established by the *Roth* court for showing a deprivation of "liberty." The evidence did not show serious damages to reputation or foreclosure of opportunities amounting to a deprivation of liberty. (See *Schwartz* v. *Thompson* (2d Cir. 1974) 497 F.2d 430, 432; *Blair* v. *Board of Reg. of State Univ. & Com. Col. Sys., Tenn.* (6th Cir. 1974) 496 F.2d 322, 324; *Adams* v. *Walker* (7th Cir. 1974) 492 F.2d 1003, 1008-1009; *Jablon* v. *Trustees of California State Colleges* (9th Cir. 1973) 482 F.2d 997, 999-1000, cert. den., 414 U.S. 1163 [39 L.Ed.2d 116, 94 S.Ct. 926]; *Olson* v. *Trustees of California State Universities* (C.D.Cal. 1972) 351 F.Supp. 430, 432.) The economics department had 22 full-time faculty members at the time of the president's action. The president's letter suspending the consultative rights of the department of economics and placing the department in receivership did not point to or single out any individual faculty member. As the trial court indicated in its memorandum of decision, "the action indicated that the Department, taken as a whole, and as an entity was unable to govern itself; that some of the members of the Department were unable to get along with one another to the detriment of the teaching program. Although this action did indicate that the conduct of some of the professors was less than exemplary, the said action cannot be said with any degree of certainty to injure the honor, good name or reputation of all of the professors, or any one professor specifically."

Additionally, the evidence introduced at trial failed to establish that appellants had suffered any loss of reputation or good name. Dr. Sasseen, associate vice-president and dean of the faculty at San Jose State University, reviewed a survey of the professional activities of the faculty of the economics department since September 1974, and testified that "the professional activity of the faculty in that department proceeds at pace and there is no evidence of harm to it in terms of lessening of professional activity." Dr. Sasseen stated that many of the activities

engaged in by members of the department were the result of invitations to them to participate and other activities were initiated as a result of a member of the department offering a professional paper. Student enrollment in the department of economics continued to be strong. In fact, from the spring of 1973 through the spring of 1975, enrollment in the department of economics showed a steady and continued growth, whereas enrollment in other departments was declining. There was evidence that professional activities such as the ability to teach and to advise students, to engage in scholarly activity and research, to write articles for publication and read professional papers, and to be members of professional associations, have a far greater impact on a professor's professional reputation than his entitlement to be consulted on personnel and policy decisions of the department. Appellants' teaching responsibilities or other duties were not affected by the disenfranchisement; they were not censured by any of the professional associations to which they belonged. Appellant Primack was continuing to co-author a book with another member of the faculty of the department of economics after the disenfranchisement. Appellant Mings was working on a proposal for an experimental course and was invited to present the course to the executive committee.

Although there was evidence that the disenfranchisement of the department had received some newspaper publicity, there was no evidence that appellants' reputations had been damaged by the articles. In fact, Professor Moses Abramovitz, professor of economics at nearby Stanford University, knew generally that the department of economics at San Jose State University had been placed in receivership, but knew little more about the matter and did not know the names of the individual appellants involved in this action. There is nothing in the president's action which imposed a stigma or "badge of infamy" upon appellants. Appellants have failed to establish that they have been stigmatized in a manner which limits employment opportunities, or that they have been individually damaged in their standing or associations in the community; the trial court is to be upheld in its determination that appellants have failed to establish that there has been any deprivation of a "liberty" interest in the present case. (See *Sayah* v. *United States* (C.D.Cal. 1973) 355 F.Supp. 1008, 1115; *Adams* v. *Walker, supra,* 492 F.2d 1003, 1008-1009; *Jablon* v. *Trustees of California State Colleges, supra,* 482 F.2d 997, 1000.)

Appellants contend that the trial court erred in determining that appellants did not have any "property" right in the consultative process

and that, therefore, their participation in that process could lawfully be suspended without extending to appellants the protection of due process of law. ■ Availability of the constitutional protection of procedural due process does not depend upon whether a benefit is characterized as a "right" or as a "privilege." (*Board of Regents* v. *Roth, supra,* 408 U.S. 564, 571 [33 L.Ed.2d 548, 557].) The property interests safeguarded by procedural due process take many forms. (*Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 456 [121 Cal.Rptr. 585, 535 P.2d 713].) However, the range of interests protected by procedural due process is not infinite. Therefore, "while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries." (*Board of Regents* v. *Roth, supra,* 408 U.S. 564, 570, 572 [33 L.Ed.2d 548, 557-558].) In determining whether due process protections apply, it is necessary to look to the nature of the interest at stake. (*Board of Regents* v. *Roth, supra,* at p. 571 [33 L.Ed.2d at p. 557]; *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].)

Property interests are not created by the Constitution. Such interests are created and their dimensions are defined by "existing rules or understandings" found in some independent source such as state law. (*Arnett* v. *Kennedy* (1974) 416 U.S. 134, 151, 165, 185 [40 L.Ed.2d 15, 31-32, 39-40, 51, 94 S.Ct. 1633], reh. den., 417 U.S. 977 [41 L.Ed.2d 1148, 94 S.Ct. 3187]; *Perry* v. *Sindermann, supra,* 408 U.S. 593, 601, 602 at fn. 7 [33 L.Ed.2d 570, 579-580]; see *Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, 456.)

■ The trustees of the California State University and Colleges are the governing body of the state university system. Section 24201 of the Education Code directs the trustees to "provide by rule" for the government of their appointees and employees, including appointment, terms, tenure, dismissal and demotion. (See *Zumwalt* v. *Trustees of Cal. State Colleges* (1973) 33 Cal.App.3d 665, 672 [109 Cal.Rptr. 344]; see also Ed. Code, § 23604.) Among the rules promulgated by the trustees of the California State University and Colleges are sections 42701 and 42702 of title 5 of the California Administrative Code. Section 42701 provides: "It is the policy of the Trustees that faculty be consulted on academic personnel matters. Each campus shall develop campus-wide procedures whereby only members of the faculty who are tenured, and such department chairmen and academic administrators as the campus procedures shall provide, may participate at any level of consideration in the deliberations or vote on recommendations relating to appointment,

retention, tenure or promotion of faculty. The procedures shall provide that those making such recommendations should consider information from other faculty members and any other source, including, but not limited to students. The campus-wide procedures shall be consonant with the regulations, policies and procedures of the Board of Trustees and the Chancellor and shall be approved by the president."

Section 42702, subdivision (d), states that the president of each campus or his designee "using the consultative procedures established pursuant to Section 42701" shall make all appointments and promotions of academic employees, and award or deny tenure to probationary academic employees. The particular consultative procedure adopted at San Jose State University provided that tenured faculty members were entitled to participate in deliberations or voting on personnel recommendations. The faculty handbook stated that all tenured faculty members of a department constituted the official body for making initial personnel recommendations, but that the tenured faculty members of a department could delegate their responsibility to a committee or separate committees for such matters as recruitment, retention and tenure, and promotion recommendations. (See Faculty Reference Book, Cal. State Univ., San Jose (1973).) The right of the tenured faculty to make formal recommendations on all personnel decisions at the departmental level is based upon general academic custom, is codified in administrative regulations, and is delineated in formal campus-wide procedures. The consultative procedure exists in every department at San Jose State University. Although the consultative procedure is advisory only, and the administration is not bound by the faculty's recommendations, the testimony at trial was that the consultative right affords the tenured faculty an opportunity to influence the character of the department by having an impact on the curriculum and direction of the departments and that participation in the faculty self-governance process is a valuable component of tenure. In fact, faculty recommendations usually have a great deal of influence on the ultimate decision that is made.

We conclude that appellants have shown that a tenured professor has a cognizable property interest or a "legitimate claim of entitlement" to the consultative right under both the written rules and regulations and policies and practices of the institution. (See *Roane* v. *Callisburg Independent School District* (5th Cir. 1975) 511 F.2d 633, 638.) That interest is entitled to protection even though it could be terminated by repeal of the regulations establishing the procedure.

Although the right to be consulted in the present case is created by "existing rules or understandings that stem from an independent source" (see *Board of Regents* v. *Roth, supra,* 408 U.S. at p. 577 [33 L.Ed.2d at p. 561]) and could not, consistent with due process, be suspended without notice and an opportunity to comment, it does not appear that appellants have been denied due process. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 481 [33 L.Ed.2d 484, 494].) Since the types of property protected by the due process clause vary widely, what may be required by that clause in dealing with one set of interests may not be required in dealing with another set of interests. (*Arnett* v. *Kennedy, supra,* 416 U.S. 134; *Abeyta* v. *Town of Taos, supra,* 499 F.2d 323, 327.) The formality and procedural requisites for the hearing which must be accorded prior to deprivation of a protected interest can vary depending upon the importance of the interests involved, the nature of any subsequent proceedings, and the length and severity of the deprivation. (See *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 378 [28 L.Ed.2d 113, 119, 91 S.Ct. 780]; *Fuentes* v. *Shevin* (1972) 407 U.S. 67, 86 [32 L.Ed.2d 556, 573, 92 S.Ct. 1983], reh. den., 409 U.S. 902 [34 L.Ed.2d 165, 93 S.Ct. 177].) Although the right to be consulted could not be suspended with no fair process at all, it is important to bear in mind that this is not a situation where appellants have been deprived of their employment nor of benefits constituting their "means for daily subsistence" (see *Goldberg* v. *Kelly* (1972) 397 U.S. 254, 264 [25 L.Ed.2d 287, 297, 90 S.Ct. 1011]); neither have they been deprived of their teaching assignments nor of their tenure. Additionally, the consultative right is solely advisory. Thus, the magnitude of the interest involved in this case is much less than that which was involved in such cases as *Perry* v. *Sindermann, supra,* 408 U.S. 593, or *Goldberg* v. *Kelly, supra,* 397 U.S. 254.

Appellants each received a copy of the May 14, 1974, letter from Academic Vice-President Hobart Burns to Dean Sawrey, charging the school of social sciences factfinding committee with the issues it was to investigate. Appellants each received from Dean Sawrey a second notice of the charge to the committee. Appellants were invited to submit written statements to the factfinding committee; each did so. Prior to President Bunzel's September 9 letter, appellants and the other full-time members of the economics department were asked to meet with Academic Vice-President Burns. At this meeting, Dr. Burns discussed with appellants President Bunzel's decision to place the economics department in receivership. In October, after having received President Bunzel's formal

letter of disenfranchisement, each of the appellants initiated grievance procedures as provided by the chancellor's Executive Order 201. All except appellant Primack participated in extensive hearings which were conducted in conformance with Executive Order 201. Each chose to present his grievance before a panel of faculty members as provided by section 7.2 of Executive Order 201; none chose the available alternative (§ 9.4.2) of appearing with counsel before a hearing officer of the Office of Administrative Hearings.

Additionally, the president accepted the academic senate liaison committee's proposal to conduct hearings regarding the disenfranchisement of the economics department, and appellants Mings and Primack gave extensive testimony at these liaison committee hearings.

Appellants were not deprived of their "property" interest in the consultative process without due process of law.

The judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.